**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE LEE GOODMAN TRUST, Individually and on behalf of all others similarly situated, | Case No: 1:23-CV-02900 |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| WHEELS UP EXPERIENCE INC., KENNETH DICHTER, and TODD SMITH, | <u>CLASS ACTION</u> |
| Defendants. | |

Lead Plaintiff Scott Schleicher ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Amended Complaint against Defendants Wheels Up Experience Inc. ("Wheels Up" of "Company"), Kenneth Dichter ("Dichter"), and Todd Smith ("Smith"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wheels Up, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Wheels Up securities between November 9, 2022, and March 31, 2023,

inclusive ("Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 ("Exchange Act").

2.     On March 31, 2023, Wheels Up restated its third quarter 2022 financial results, recognizing a $62 million goodwill impairment. Defendants' failure to test goodwill earlier, despite knowing the circumstances existed mandating an impairment analysis both as of September 30, 2022 and as of October 1, 2022, was severely reckless, damaging investors.

3.     Defendants knew that generally accepted accounting principles ("GAAP") required them to test for impairment of goodwill annually. They knew that since at least 2019, Wheels Up conducted that annual impairment on October 1. On October 1, 2022, however, in violation of GAAP, they simply did not do it.

4.     Defendants knew, too, that GAAP required them to perform an interim goodwill impairment test when circumstances required. Indeed, in the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2022, that Defendants Dichter and Smith signed and certified, Defendants disclosed that on June 1, 2022, with declining stock price and operating margins—two predicates indicating the necessity of impairment testing—they performed interim testing. They determined not to impair goodwill at that time. By September 30, 2022, therefore, Defendants knew the circumstances indicating the necessity for testing, tracked those circumstances closely, and, critically, knew that Wheels Up's stock price and operating margin continued declining in 3Q 2022. Armed with this information, however, Defendants recklessly failed to perform interim impairment testing as of September 30, 2022. Had Defendants performed their required annual goodwill impairment analysis just one day later, they would have

disclosed at the beginning of the Class Period that GAAP required Wheels Up to impair its goodwill by $62 million, and timely taken that impairment.

5.      Defendants' fraud allowed Wheel Up to present a more positive picture of the Company's financial condition than the truth would have shown. By failing to impair goodwill in Q3 2022, Wheels Up understated Loss for Operations by 41%, Net Loss by 42%, and Loss per Share by 41%

6.      Defendants' failures led to the restatement, and to Defendants' belated admission that they should have recognized the $62 million impairment on September 30, 2022.

7.      In direct response to their disclosure of the restatement, impairing goodwill, Wheels Up's stock price fell by 11%, damaging investors.

## II.      JURISDICTION AND VENUE

8.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

10.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

11.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

III.    **PARTIES**

12.    Plaintiff, as set forth in his previously filed certification, (Dkt. No. 14-2), incorporated by reference herein, purchased Wheels Up securities during the Class Period and was economically damaged thereby.

13.    Defendant Wheels Up Experience Inc. provides private aviation services in the United States and abroad. The company offers membership programs, charter, aircraft management, whole aircraft sales, and commercial travel services. It also provides freight, safety, and security solutions, as well as managed services. The company serves individuals, industry, government, and civil organizations. Defendant Wheels Up is incorporated in Delaware and its principal office is located at 601 West 26th Street, Suite 900, New York, New York, 10001. Wheels Up securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "UP."

14.    Defendant Dichter founded the Company in 2013 and served as the Company's Chief Executive Officer ("CEO") from its inception and through the Class Period. Dichter also served as Chairman of the Board of Directors, and "chief operating decision maker." Wheels Up stated in the March 31, 2023, annual filing for the period ended December 31, 2022 ("2022 10-K") that Dichter "reviews our financial information presented on a consolidated basis." On May 9, 2023, Wheels Up announced that Dichter had resigned effective immediately as CEO and Chairman of the Board. Dichter signed and certified all quarterly and annual filings from 2021 through the end of the Class Period.

15.    Defendant Smith began serving as Wheels Up's Company's Chief Financial Officer ("CFO") on June 30, 2022, and served in that role throughout the Class Period. Smith signed and certified all quarterly and annual filings starting with the August 11, 2022 quarterly

4

filing for the period ended June 30, 2022 ("Q2 2022 10-Q"), and through the entire Class Period..

On May 9, 2023, Smith became Interim CEO while remaining as CFO.

16.     Defendants Dichter and Smith are collectively referred to herein as the "Individual

Defendants."

17.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the
highest levels;

(c)     was privy to confidential proprietary information concerning the Company
and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or
disseminating the false and misleading statements and information alleged
herein;

(e)     was directly or indirectly involved in the oversight or implementation of
the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and
misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities
laws.

18.     For each quarterly and annual statement during the Class Period, Defendants

Dichter and Smith signed Certifications stating that:

(a)     I have reviewed this annual report on Form [10-K or 10-Q] of Wheels Up
Experience Inc.

(b)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(c)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(d)     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

1)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

2)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

3)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

4)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

19.     Further, in each quarterly and annual statement during the Class Period,

Defendants Dichter and Smith signed SOX certifications stating that "To my knowledge, the

information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report."

20.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

21.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Wheels Up under *respondeat superior* and agency principles.

22.     Defendant Wheels Up and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

23.     Aspirational Consumer Lifestyle Corp. ("Aspirational") was created as a Special Purpose Acquisition Company ("SPAC") in September, 2020 for the purpose of effecting a business combination.

24.     On February 1, 2021, Aspirational and Wheels Up reached an Agreement and Plan of Merger. On July 13, 20211, the merger was consummated. On July 14, 2021, shares of the combined business, called Wheels Up, began trading on the New York Stock exchange under the ticker symbol "UP."

25.     Defendant Dichter founded Wheels Up in 2013 to provide "on demand" private aviation in the United States. According to Defendants, the Company became one of the largest private aviation companies in the world. Wheels Up uses a membership/on-demand business model. Members can book private aircraft from the company fleet and third-party operators using a mobile application.

26.     In an April 1, 2022, press release, Wheels Up announced it had closed on its acquisition of Air Partner PLC ("Air Partner"), a U.K.-based global aviation services group with operations in 18 locations and across four continents. Wheels Up described Air Partner as "historically profitable."

27.     With the purchase Wheels Up recognized two separate operating units: Air Partner, for business outside of the North America., and the legacy Private Aviation Service ("Legacy"), for business in the North America.

**B.      Generally Accepted Accounting Principles**

28.     Generally Accepted Accounting Principles ("GAAP") are a common set of accounting principles, conventions, standards, and procedures recognized by the accounting profession as defining the accepted accounting practices at a particular time. Companies in the United States use GAAP to prepare their financial statements.

29.     The SEC has the statutory authority for the promulgation of GAAP for public companies, and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The SEC Rules and interpretive releases, and the FASB Accounting Standards Codification ("ASC"), represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that SEC-filed financial statements which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures, unless the SEC has otherwise provided.

**1.      Accounting for Goodwill**

30.     ASC 350-20 addresses the application of GAAP to accounting and financial reporting for goodwill. Goodwill is defined as "an asset representing the future economic benefits arising from other assets acquired in a business combination." ASC 350-20-20. Goodwill is created in an acquisition and is initially measured as the excess of the purchase price over the

value of identifiable assets acquired and liabilities assumed in a business combination. ASC 805-30-30-1.

31.     Goodwill is not amortized but is instead tested for impairment at the reporting unit level. ASC 350-20-35-1. "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value." ASC 350-20-35-2. A "reporting unit is an operating segment or one level below an operating segment (also known as a component)." ASC 350-20-20. Following the Air Partner acquisition, Wheels Up recognized Legacy and Air Partner as separate reporting units.

32.     Once a year, at the same time each year on a date of a company's choosing, a company must evaluate goodwill for impairment. ASC 350-20-35-28. Wheels Up conducted its annual impairment tests as of October 1st of each year.

33.     GAAP requires that the "goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30.

34.     GAAP contains the following examples of events and circumstances, **triggering events**, which could trigger an interim goodwill impairment test:

(a)     Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets.

(b)     Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development.

(c)     Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows.

(d)     Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods.

(e)     Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation.

(f)     Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

(g)     If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

ASC 350-20-35-3C.

35.     The above list is not all-inclusive. The SEC staff provided the following examples for management to consider as potential triggers for an interim goodwill impairment test:

(a)     Other impairment charges or valuation allowances.

(b)     Recent cash or operating losses for reporting unit due to market conditions with expectation they may continue.

(c)     Weakness in particular industry (e.g., airlines, auto, banks, retail, etc.).

(d)     Inability to meet quarterly expectations or downward revisions to forecasts for future periods.

(e)     Restructuring Plans (e.g., Store Closures, Layoffs, etc.).

(f)     Decline in market capitalization below book value.

(1)     External market events on sector/industry. Is discount, decline, or volatility greater than market?

(2)     Short-term spikes in short selling.

(3)    Above factors should be considered in light of duration and severity of difference.[1]

36.    When evaluating whether triggering events have occurred, "[a]n entity shall evaluate, on the basis of the weight of evidence, the significance of all identified events and circumstances in the context of determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount." ASC 350-20-35-3G. Further:

> An entity shall consider other relevant events and circumstances that affect the fair value or carrying amount of a reporting unit … . An entity shall consider the extent to which each of the adverse events and circumstances identified could affect the comparison of a reporting unit's fair value with its carrying amount. An entity should place more weight on the events and circumstances that most affect a reporting unit's fair value or the carrying amount of its net assets. An entity also should consider positive and mitigating events and circumstances that may affect its determination of whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If an entity has a recent fair value calculation for a reporting unit, it also should include as a factor in its consideration the difference between the fair value and the carrying amount in reaching its conclusion about whether to perform the quantitative goodwill impairment test. ASC 350-20-35-3F.

37.    A goodwill impairment test consists of a qualitative and a quantitative assessment. The qualitative assessment acts as a screen to determine if it is necessary to perform the quantitative test. A Company has an option to first perform (or bypass) a qualitative assessment of goodwill to determine whether it is necessary to perform the quantitative goodwill impairment test. ASC 350-20-35-3 – 3B. The factors to consider in making a qualitative analysis are the same as the aforementioned events and circumstances which could trigger an interim goodwill impairment test. ASC 350-20-35-3C.

---

[1] National Conference on Current SEC & PCAOB Developments - December 9, 2008 (https://www.sec.gov/news/speech/2008/spch120908wc-slides.pdf).

38.     If, after assessing the totality of events or circumstances, an entity determines that it is <u>not</u> more likely than not (that is, a likelihood of not more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, then the quantitative goodwill impairment tests are unnecessary. However, if determined to be necessary, quantitative impairment tests are performed to identify and measure goodwill impairment. ASC 350-20-35-3E.

39.     "The quantitative goodwill impairment test, used to identify both the existence of impairment and the amount of impairment loss, compares the fair value of a reporting unit with its carrying amount, including goodwill." ASC 350-20-35-4. If the carrying amount (i.e., the amount recorded on the books) exceeds the fair value of the reporting unit, then goodwill is considered impaired and an impairment loss is recognized in an amount equal to that excess, up to the amount of goodwill allocated to that reporting unit. ASC 350-20-35-6 and ASC 350-20-35-8.

40.     In their Annual report for the period ended December 31, 2021 ("2021 10-K"), with respect to goodwill, Defendants disclosed:

> Goodwill and Intangibles
>
> Goodwill represents the excess of the consideration transferred over the fair value of the identifiable assets acquired and liabilities assumed in business combinations. The carrying value of goodwill is tested for impairment on an annual basis or on an interim basis if events or changes in circumstances indicate that an impairment loss may have occurred (i.e., a triggering event). Our annual goodwill impairment testing date is October 1st. We are required to test goodwill on a reporting unit basis. We determined private aviation services is our one reporting unit to which the entire amount of goodwill is allocated.
>
> Goodwill impairment is the amount by which our reporting unit's carrying value exceeds its fair value, not to exceed the carrying value of goodwill. We use both qualitative and quantitative approaches when testing goodwill for impairment. Our qualitative approach evaluates various events including, but not limited to, macroeconomic conditions, changes in the business environment in

which we operate, a sustained decrease in our share price and other specific facts and circumstances. If, after assessing qualitative factors, we determine that it is more-likely-than-not that the fair value of our reporting unit is greater than the carrying value, then performing a quantitative impairment assessment is unnecessary and our goodwill is not considered to be impaired. However, if based on the qualitative assessment we conclude that it is more-likely-than-not that the fair value of the reporting unit is less than the carrying value, or if we elect to skip the optional qualitative assessment approach, we proceed with performing the quantitative impairment assessment, to quantify the amount of impairment, if any.

When a quantitative impairment assessment is performed, we primarily determine the fair value of our reporting unit using a discounted cash flow model, or income approach, and supplement this with observable valuation multiples for comparable companies, as appropriate. The completion of the discounted cash flow model requires that we make a number of significant estimates and assumptions, which include projections of future revenue, costs and expenses, capital expenditures and working capital changes, as well as assumptions about the estimated weighted average cost of capital and other relevant variables. We base our estimates and assumptions on our recent performance, our expectations of future performance, economic or market conditions and other assumptions we believe to be reasonable. Actual future results may differ from those estimates.

Intangible assets, other than goodwill, acquired in a business combination are recognized at their fair value as of the date of acquisition. We periodically reassess the useful lives of our definite-lived intangible assets when events or circumstances indicate that useful lives have significantly changed from the previous estimate.

**2.    GAAP Requires Disclosure of Material Events That Occur Subsequent to a Reporting Period's Close but Before the Periodic SEC Filing**

41.    GAAP defines subsequent events as "[e]vents or transactions that occur after the balance sheet date but before financial statements are issued" and classifies them into two types:

(a)    The first type consists of events or transactions that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing financial statements (that is, recognized subsequent events).

(b)      The second type consists of events that provide evidence about conditions that did not exist at the date of the balance sheet but arose subsequent to that date (that is, nonrecognized subsequent events). ASC 855-10-20.

42.      ASC 850, the authoritative standard for accounting and disclosure of subsequent events states that "[s]ome nonrecognized subsequent events may be of such nature that they must be disclosed to keep the financial statements from being misleading." For such events, ASC 850 requires a company to disclose (a) the nature of the event and (b) an estimate of its financial effect, or a statement that such an estimate cannot be made. ASC 855-10-50-2.

43.      One of the examples of a nonrecognized subsequent event provided in ASC 855 is "[c]hanges in the fair value of assets or liabilities (financial or nonfinancial) or foreign exchange rates after the balance sheet date but before financial statements are issued." ASC 855-10-55-2.

44.      Wheels Up tests its goodwill for impairment at least annually, as of October 1st. On November 9, 2022, Wheels Up filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2022, ("Q3 2022 10-Q"), over five weeks after GAAP required Defendants to perform the Company's annual goodwill impairment analysis. Although Wheels Up's financial statements included in its Q3 2022 10-Q contained a "subsequent events" note, because of their failure to perform annual impairment testing in violation of GAAP, they omitted reference to the necessity to impair goodwill by $62 million.

**C.      Wheels Up's Goodwill Impairment Analyses Policies and Practices**

45.      Wheels Up acknowledged that its quantitative goodwill assessment could be significantly impacted by changes in certain key assumptions and, therefore, the Company should have monitored changes in these conditions in evaluating whether triggering events had occurred:

Quantitative   impairment   assessments   are   sensitive   to   key

14

assumptions, such as **expected future cash flows, the degree of volatility in equity and debt markets, and our stock price**. If the assumptions used in our assessments are not realized, or such assumptions change due to a change in business or market conditions impacting **our forecasts**, **rises in interest rates** that impact our estimate of weighted average cost of capital, or if the **trading price of our Class A common stock** declines significantly from historical levels, it is possible that an additional impairment charge for tangible or intangible assets, including goodwill, may need to be recorded in the future, including as result of the effects of factors outside our control on our flight schedules and business.[2]

46.     Wheels Up's accounting policy was consistent with GAAP. The Company disclosed that its fair value estimates were primarily derived from discounted cash flows projections for future periods:

> Goodwill impairment is the amount by which our reporting unit's carrying value exceeds its fair value, not to exceed the carrying value of goodwill. We use both qualitative and quantitative approaches when testing goodwill for impairment…. If, after assessing qualitative factors, we determine that it is more-likely-than-not that the fair value of our reporting unit is greater than the carrying value, then performing a quantitative impairment assessment is unnecessary and our goodwill is not considered to be impaired. However, if based on the qualitative assessment we cannot conclude that it is more-likely-than-not that the fair value of the reporting unit exceeds its carrying value, or if we elect to skip the optional qualitative assessment approach, we proceed with performing the quantitative impairment assessment primarily using a discounted cash flow model, or income approach, to quantify the amount of impairment, if any.

47.     In its 2021 10-K, the Company announced that during the fourth quarter of 2021, the Company tested goodwill for impairment as of October 1, 2021, during its required annual impairment, and again as of December 15, 2021, due to the presence of triggering events, using the discounted cash flow approach, which did not result in impairment of goodwill:

---

[2] All emphases added unless otherwise noted.

We performed a quantitative annual assessment on October 1, 2021. Our quantitative assessment, using a discounted cash flow approach did not result in an indication that the fair value of our reporting unit was less than the carrying value. During the fourth quarter of 2021, we determined that **because of a sustained decrease in our share price from the Closing Date, combined with a decline in our margins**, there was an indication a triggering event occurred. As such, we deemed it necessary to perform an interim quantitative impairment assessment of goodwill on December 15, 2021, using a discounted cash flow approach, which did not result in impairment to goodwill.

48.     Defendants included in the 2021 10-K, the audit opinion of the Company's independent auditor, Grant Thornton's. Grant Thornton disclosed the following "critical audit matter" that it communicated to Wheels Up's Audit Committee:

*Goodwill*

[T]he Company performed a goodwill impairment assessment as of October 1, 2021, the date of its annual impairment test, and again as of December 15, 2021 **due to the presence of certain indicators resulting in a triggering event.** We identified the Company's goodwill impairment assessment as a critical audit matter.

The principal considerations for our determination that this is a critical audit matter are the significant management estimates and judgments required to assess the reporting unit's fair value, which include the determination of discount rates, revenue growth rates, margins, and other projected long-term rates. Auditing these estimates and assumptions requires a high degree of auditor judgment.

Our audit procedures related to the goodwill impairment testing included the following, among others:

•We evaluated management's identification of triggering events, which included consideration of current market conditions.

•We evaluated management's revenue growth rates, margins, and cash flows for consistency with relevant historical data, recent changes in the business, and external industry data and forecasts.

•With the assistance of our valuation professionals with specialized skills and knowledge, we evaluated the valuation methodologies, inputs, and assumptions utilized by management.

•We performed sensitivity analyses on the future revenue, long-term growth rates, margins, and discount rates used to evaluate the impact changes in these assumptions have on management's conclusion.

•We tested management's reconciliation of the carrying value of the Company to its market value.

49.     In the 2021 10-K, Wheels Up also disclosed that it had performed the required goodwill impairment analysis on both October 1, 2020, and October 1, 2019. These statements refer to goodwill impairment testing Wheels Up claims to have performed and not to Aspirational. First, Aspirational did not exist on October 1, 2019. Second, with respect to the 2020 annual goodwill impairment analysis, the Company wrote about the Legacy aviation business and not Aspirational, stating:

> During 2020, due to the initial **negative effect of COVID-19 on overall travel demand and our business**, as well as the uncertainty in anticipated versus actual rates of recovery, in addition to our annual goodwill impairment assessment on October 1st, we deemed it necessary to perform an interim quantitative impairment assessment of goodwill on April 30, 2020, using the estimated future discounted cash flows of our reporting unit, which did not result in impairment to goodwill. We performed a qualitative annual assessment on October 1, 2020, as the estimated fair value of our reporting unit significantly exceeded the carrying value on April 30, 2020. Our qualitative assessment did not result in an indication that the fair value of our reporting unit was less than the carrying value.

50.     Wheels Up was in the travel demand business, and thus COVID-19 was a relevant point in analyzing its business. Aspirational was not in the travel business, and indeed had no business, much less one that could have been affected by COVID-19. Thus, the references to annual goodwill impairment analyses in 2019 and 2020 refer to Wheels Up, not As2pirational.

1.    **The 2021 10-K Establishes the Company's Practice for Annual Goodwill Impairment Testing**

51.    Defendant Dichter signed and certified the 2021 10-K. Its language, too, manifests his actual knowledge of Wheels Up's goodwill impairment testing, both process and substance, including the circumstances that should cause interim impairment testing. The 2021 10-K disclosed that:

> We performed a quantitative annual assessment on October 1, 2021. Our quantitative assessment … us[ed] a discounted cash flow approach…. During the fourth quarter of 2021, we determined that because of a sustained decrease in our share price from the Closing Date, combined with a decline in our margins, there was an indication a triggering event occurred. As such, we deemed it necessary to perform an interim quantitative impairment assessment of goodwill….

52.    This disclosure indicates that Dichter had actual knowledge of both the goodwill impairment testing process, and of the substantive circumstances that should cause them to perform an interim impairment test and under what circumstances actually to impair for both interim testing and annual testing. Further, it establishes that Dichter tracked, on an ongoing basis, both Wheels Up's stock price and its operating margins.

2.    **Q2 2022 Goodwill Interim Impairment Testing**

53.    Defendants Dichter and Smith signed and certified the Q2 2022 10-Q, disclosing that during Q2 2022, Defendants had performed an interim goodwill impairment test as of June 1, 2022:

> During the second quarter of 2022, we determined that because of a sustained decrease in the quoted market price of our Class A common stock from the Closing Date, combined with a further decline in our operating margins, there was an indication that a triggering event occurred and the carrying value of our long-lived assets and goodwill may not be recoverable. As a result, we performed an undiscounted cash flow analysis of our long-lived assets for potential impairment as of June 1, 2022, and based on the analysis, it was determined that there was no impairment to our

> long-lived assets. In addition, we performed an interim quantitative impairment assessment of goodwill on June 1, 2022, using a discounted cash flow approach, which did not result in impairment to goodwill.

54.     This disclosure indicates, therefore, that both Dichter and Smith each had actual knowledge of both the goodwill impairment testing process, and of the substantive circumstances that should have caused them to perform an interim impairment test and under what circumstances actually to impair for both interim testing and annual testing. In addition, this disclosure establishes that Dichter and Smith tracked, on an ongoing basis, both Wheels Up's stock price and its operating margins, the metrics that had caused Wheels Up to perform impairment testing on June 1, 2022 and that ultimately caused it to restate the Company's Q3 2022 results, impairing goodwill by $62 million.

### 3.     Q3 2022 Stock Price Decline and Margin Decline

55.     As the 2022 Form 10-K details, during Q3 2022, Wheels Up continued to experience a decline in its stock performance, at a much greater magnitude than a broader industry decline. In the 1022 10-Q, Wheels Up included the following chart.:



56.     As a result of the stock price decline, Wheels Up's market capitalization (calculated as the market price per common share multiplied by the number of common shares outstanding) declined 40.7% during Q3 2022 (from $476.3m to $282.6m), which more than doubled the gap

19

(or the shortfall) between the carrying value of the Company's equity and the market capitalization (from approximately $106.4 million to $226.8 million). These conditions, combined with the increase in the discount rate used in the quantitative analysis, should have caused Wheels Up to recognize the occurrence of a triggering event during Q3 2023 and perform an interim goodwill impairment test.

57.     As noted above, both Dichter and Smith signed and certified the Q2 2022 10-Q and had actual knowledge of both the goodwill impairment testing process, and of the substantive circumstances that should have caused them to perform an interim impairment test and under what circumstances actually to impair for both interim testing and annual testing. As such, with respect to Q3 2022, both Smith and Dichter had actual knowledge of both process and substance relating to impairment that Defendants have conceded should have caused them to impair as of September 30, 2022.

58.     Wheels Up also continued to experience negative operating margins, more than 20% in the negative each quarter after the business combination with Aspirational:



59.     As noted above, both Smith and Dichter had actual knowledge of both process and substance relating to impairment. Both tracked margins, and knew that, quarter after quarter, operating margins were negative, and worse than 20% negative each quarter. Since both Smith and Dichter had actual knowledge of both process and substance relating to impairment that Defendants have conceded should have caused them to impair as of September 30, 2022, Defendants should have conducted impaired goodwill as of September 30, 2022.

60.     Materially misrepresenting the value of its goodwill as of September 30, 2022, however, in its November 9, 2022, Q3 2022 10-Q, Defendants disclosed that they did not perform an interim goodwill impairment test due to lack of triggering events during the quarter, stating, "[t]here were no changes in circumstances or events which indicated a triggering event occurred or that the carrying value of our long-lived assets and goodwill may not be recoverable as of September 30, 2022."

61.     On March 31, 2023, however, restating the Company's Q3 2022 financials, Defendants admitted that the very triggering events they had tracked closely since no later than June 1, 2022, existed as of September 30, 2022, and Defendants should have both performed interim goodwill impairment testing and impaired goodwill materially. They stated:

> **During the third quarter of 2022, we determined that because of continued deterioration in our stock price, resulting in a market capitalization that was below the carrying value of our equity, there was an indication that a triggering event occurred and the carrying value of [] Legacy may not be recoverable.** As a result, we performed a quantitative impairment test using the income approach. The fair value using the income approach was based on the present value of estimated future cash flows. The significant underlying unobservable inputs used to measure the fair value included forecasted revenue growth rates and margins, weighted average cost of capital, normalized working capital level and projected long-term growth rates. **As a result of this assessment, a goodwill impairment charge of $62.0 million was recorded to [] Legacy as of September 30, 2022. The decline in the fair value**

**of the reporting unit, as compared to the quantitative analysis performed as of June 1, 2022, was primarily due to an increase in the discount rate**.

62.     Had Defendants performed annual goodwill impairment testing on October 1, 2022, as it was required to do regardless of the occurrence of triggering events, it would have led to a timely finding that its goodwill was impaired by $62 million. This is the same amount that the Defendants admitted the Company's goodwill was impaired just one day earlier, as of September 30, 2022, as Defendants stated in the restated Q3 2022 10-Q, filed on March 31, 2023. Wheels Up, however, did not perform its required annual goodwill impairment analysis on October 1, 2022, as it was required to do. Wheels Up never announced that it had performed its annual goodwill impairment analysis on October 1, 2022, even as it had announced previously that it had performed its annual impairment testing on October 1st of both 2021 and 2020. Further, in announcing the Q3 2022 impairment in the March 31, 2023, restatement, Wheels Up admitted that it had only belatedly performed a quantitative impairment analysis of the Legacy reporting unit as of September 30, 2022, and concluded that date was so close to October 1, that there was "no additional impairment as of October 1, 2022." Thus, in violation of GAAP, Wheels Up simply skipped the required October 1, 2022, goodwill impairment analysis.

> **4.     Defendants' Failure to Impair Goodwill as of September 30, 2022, or to Conduct the Company's Annual Goodwill Impairment Testing was Severely Reckless**

63.     GAAP requires Wheels Up to perform annual goodwill impairment testing annually, on the same date each year. Wheels Up chose to perform its annual analysis on October 1st of each year.

64.     In Wheels Up's 2021 10-K, Defendants disclosed that Wheels Up had "performed a qualitative annual assessment as of October 1, 2021." Wheels Up further disclosed that it had "performed a quantitative annual assessment as of October 1, 2020," as well as in 2019.

65.     Defendants Dichter and Smith both tracked the Company's stock price and operating margins. Both signed and certified quarterly and annual filings, even before the start of the Class Period, indicating their knowledge of goodwill impairment testing and substance, including circumstances that would cause interim impairment testing.

66.     In violation of GAAP, Defendants did not cause Wheels Up to perform its annual goodwill impairment testing on October 1, 2022. Not only did Defendants omit any reference to performing the October 1, 2022, annual goodwill impairment analysis, but subsequently admitted, in the Company's restated Q3 2022 10-Q and Q4 2022 10-Q, that it did not perform the analysis. Had it done so, the annual impairment test would have led to a timely finding that its goodwill was impaired by at least $62 million as of September 30, 2022, as Defendants stated in the restatement filed on March 31, 2023. Had it performed its required annual goodwill impairment testing just one day later, on October 1, 2022, it also would have timely discovered the necessity for a $62 million goodwill impairment in Q3 2022. Had it performed the October 1, 2022 goodwill impairment testing, GAAP required them to disclose the $62 million impairment and its impact on the Company's P&L in a subsequent events Note.

67.     Further, in announcing the Q3 2022 impairment in the 2022 10-K, Wheels Up admitted that it had only belatedly performed quantitative impairment testing of the Legacy reporting unit as of September 30, 2022, and concluded that date was so close to October 1, that there was "no additional impairment as of October 1, 2022."

68.     Defendants, however, never performed the interim analysis as of September 30, 2022, during 2022, so it performed no impairment analysis in September/October 2022 as both circumstances and their own internal audit program required.

69.     Given their actual knowledge of the timing, process, and substance of the Company's impairment testing, Defendants' failure to perform the required October 1, 2022, annual impairment test was severely reckless.

70.     Given the persistence of Defendants' analysis of goodwill impairment regularly in 2020 and 2021—they knew that GAAP required the analysis and knew they, themselves, had performed it consistently—and existing circumstances of which they were aware, Defendants' failure to perform the goodwill impairment analysis either as of September 30, 2022, as circumstances required, or as of October 1, 2022, as Wheels Up's scheduled annual impairment analysis required, was severely reckless. In light of both known circumstances and Defendants' own scheduled goodwill impairment analysis, Defendants' failure to recognize the $62 million Q3 2022 goodwill impairment in its Q3 2022 10-Q following an interim goodwill impairment analysis, or in a Subsequent Events Note in its Q3 2022 10-Q, as a result of performing its required annual goodwill impairment analysis on October 1, 2022, was severely reckless.

**D.     The Meaning of a GAAP Restatement**

71.     ASC Topic 250, Accounting *Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes, and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial

statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC 250-10-20.

72.     ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

a)     The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

b)     An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

c)     Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error." ASC 250-10-45-23.

73.     ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented." ASC 250-10-50-7.

74.     In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors …concludes that any previously issued financial statements …should no longer be relied upon because of an error in such financial statements." Wheels Up made these required disclosures in its March 31, 2023 Form 8-K/A.

75.     Such disclosure of non-reliance on previously issued financial statements is associated with what is colloquially called by the accounting profession a "Big R restatement." A Big R restatement occurs when the error is *material* to the prior period financial statements. The evaluation of the materiality of a misstatement or omission in financial statements is viewed from

the standpoint of a reasonable person and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements. SAB 99. When an error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

76.    When Wheels Up restated its Q3 2022 financial results, it acknowledged the material falsity of its financial results, including the notes to the financial statements Defendants disclosed and included in the Company's Q3 2022 10-Q.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

77.    On November 9, 2022, Wheels Up filed its Form 10-Q for the period ended September 30, 2022 ("Q3 2022 10-Q"), issuing a press release discussing Q3 2022 unaudited financial results. The Company reported a net loss of $86,838,000 for the three months ended September 30, 2022 and $268,637,000 for the nine months ended September 30, 2022. The Company also reported goodwill of $521,847,000, with no goodwill impairment, and total equity of $509,435,000 as of September 30, 2022.

78.    The foregoing was materially misleading because, in violation of GAAP, Defendants knew or recklessly disregarded that:

(a)    The Q3 2022 financials it disclosed in November 2022 were materially false;

(b)    On its balance sheet, Wheels Up failed to record a goodwill impairment, overstating goodwill by $62 million total equity by $62 million;

(c)    On its income statement, for the three months ended September 30, 2022, Wheels Up understated goodwill impairment by $62 million, understated loss from

operations by $62 million, understated net loss by $62 million, and understated loss per share by $0.25, or 41%;

(d)     On its income statement, for the nine months ended September 30, 2022, Wheels Up understated goodwill impairment by $62 million, understate loss from operations by $62 million, understated net loss by $62 million, and understated loss per share by $0.25.

79.     In the Q3 2022 10-Q, Defendants Dichter and Smith stated that Wheels Up's disclosure controls and procedures were effective:

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based upon that evaluation, **our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures are effective at a reasonable assurance level.**

**Changes in Internal Control over Financial Reporting**

**[T]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2022**, which were identified in connection with management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

80.     The foregoing was materially false or misleading because Defendants knew or recklessly disregarded that Wheels Up's disclosure controls and procedures were materially ineffective as of September 30, 2022, for failing to impair the Company's goodwill by $62 million as of September 30, 2022, and in turn, materially understating the Company's net loss.

81.     In the Q3 2022 10-Q, Wheels Up included a "Subsequent Events" Note in its financial statements, but that Note did not discuss goodwill impairment testing as of October 1,

2022, or announce the material $62 million impairment it later admitted existed at the end of Q3 2022.

82.    The foregoing statements in Wheels Up's Q3 2022 10-Q about subsequent events was materially false or misleading because Defendant knew or recklessly disregarded that, in violation of GAAP:

(a)    Wheels Up was required to but did not perform a goodwill impairment analysis on October 1, 2022, one day after the end of Q3 2022;

(b)    Had Wheels Up performed the analysis, it would have concluded, as it later admitted, that it needed to impair goodwill by $62 million in Q3 2022;

(c)    Wheels Up violated GAAP by failing to disclose the goodwill impairment in its November 9, 2022, Q3 2022 10-Q.

83.    On March 9, 2023, Wheels Up filed a press release, attached to a Form 8-K, announcing financial results for the fiscal year ended December 31, 2022. The Company reported a net loss of $507,547,000, total equity of $299,920,000, and a total goodwill impairment of $132 million, loss from operations of $512,007,000, and a loss per share of $2.06.

84.    The foregoing was materially false and misleading because, in violation of GAAP, Defendants knew or recklessly disregarded that :

(a)    Defendants admitted in the restatement of both Q4 2022 and fiscal year 2022, filed on March 31, 2023, that the fiscal year 2022 financials were materially false;

(b)    On its balance sheet, Wheels Up overstated goodwill by $48 million, and overstated total equity by $48 million;

(c)     On its income statement, for fiscal year 2022, Wheels Up understated loss from operations by $48 million, understated net loss by $48 million, and understated loss per share by $0.20.

## VI.    THE TRUTH EMERGES

85.    On March 17, 2023, after market hours, the Company issued a Notification of Late Filing on Form 12b-25 regarding its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). The late filing form stated the following, in relevant part:

> ***The Company experienced unanticipated delays in compiling certain necessary information to complete its audited financial statements and prepare a complete filing of its Annual Report in a timely manner without unreasonable effort or expense.***
>
> The Company anticipates that the Annual Report will be filed as soon as practicable and prior to the fifteenth calendar day following the prescribed due date.

86.    As a direct and proximate cause of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

87.    On March 31, 2023, after the close of trading, the Company filed an 8-K/A with the SEC announcing it would restate its financial statements from September 30, 2022, to the present, and expected to report at least one material weakness. The 8-K/A stated in relevant part:

> **Item 2.02 Results of Operations and Financial Condition**.
>
> The Company is filing this Amendment No. 1 to the Original Filings to reflect adjustments to the presentation of the Company's unaudited financial statements and reconciliations of Net loss to Adjusted EBITDA, in each case contained in the Original 3Q Press Release and the Original 4Q Press Release and incorporated by reference into the Original 3Q Filing and the Original 4Q Filing, respectively. In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, **the Company determined that non-cash goodwill**

impairment charges of (i) **$62.0 million should have been recognized by the Company during the three months ended September 30, 2022, based on the Company's reassessment of the fair value of the legacy Wheels Up reporting unit (excluding Air Partner) ("WUP Legacy") as of September 30, 2022, and (ii) $118.0 million should have been recognized by the Company during the three months ended December 31, 2022 [and $180 million for the twelve months ended December 31, 2022], based on the assessment of the fair value of WUP Legacy as of December 31, 2022**, in each case that were necessary to reflect the diminished fair value of WUP Legacy as of the applicable measurement dates.

The recognition of non-cash goodwill impairment charges of $62.0 million for the three months ended September 30, 2022 and $118.0 million for the three months ended December 31, 2022 resulted in the following changes to the Company's unaudited condensed consolidated financial statements set forth in the Original Press Releases:

-For the three and nine months ended September 30, 2022, the Company recognized a charge for "Impairment of goodwill" of $62.0 million in the Company's unaudited condensed consolidated statements of operations, which resulted in:

o a $62.0 million increase to the Company's Net loss for the three and nine months ended September 30, 2022 versus the previously reported financial results;

o a revised Net loss of $148.8 million, or $0.61 per share, for the three months ended September 30, 2022, and $330.6 million, or $1.35 per share, for the nine months ended September 30, 2022; and

o corresponding adjustments, and associated impacts of the adjustments, to:

▪ the balances of the "Goodwill" [of $459,847,000] and "Accumulated deficit" [of $1,050,964,000] line items in the Company's unaudited condensed consolidated balance sheets as of September 30, 2022;

▪ the balances of "Net loss" and "Impairment of goodwill" in the Company's unaudited condensed consolidated statements of cash flows for the nine months ended September 30, 2022; and

▪ the balances of "Net loss" and "Impairment of goodwill" and the "Impairment of goodwill" reconciling item in the

30

Company's reconciliations of Net loss to Adjusted EBITDA
for the three and nine months ended September 30, 2022.

-For the three months ended December 31, 2022, the Company decreased the
charge for "Impairment of goodwill" by $14.0 million in the Company's
unaudited condensed consolidated statements of operations versus what was
reported in the Original 4Q Press Release, which resulted in:

o   a $14.0 million decrease to the Company's Net loss for the three
    months ended December 31, 2022 and, taking into account the
    impact of the non-cash goodwill impairment charge for the three
    months ended September 30, 2022, a $48 million increase to the
    Company's Net loss for the year ended December 31, 2022, in each
    case versus the previously reported financial results;

o   a revised Net loss of $224.9 million, or $0.91 per share, for the three
    months ended December 31, 2022, and $555.5 million, or $2.26 per
    share, for the year ended December 31, 2022; and

o   corresponding adjustments, and associated impacts of the
    adjustments, to the following items, in each case in the same manner
    described with respect to the "Impairment of goodwill" charge
    recognized during the three and nine months ended September 30,
    2022 above:

    ▪   the Company's unaudited condensed consolidated balance
        sheets as of December 31, 2022;

    ▪   the unaudited condensed consolidated statements of cash
        flows for the year ended December 31, 2022; and

    ▪   the reconciliations of Net loss to Adjusted EBITDA for the
        three months and year ended December 31, 2022.

    ▪   The adjustments did not impact the Company's Adjusted
        EBITDA results for the three and nine months ended
        September 30, 2022 or the three months and year ended
        December 31, 2022.

88.    The 8-K/A further stated that "[t]e Company has assessed the materiality of this

error in accordance with applicable SEC rules, and has concluded that the Prior Financial

Statements should be restated," continuing "management has determined that a material weakness

existed in the Company's internal control over financial reporting related to the financial

statement close process for the three months ended September 30, 2022."

89.     Also on March 31, 2023, after the close of trading, Wheels Up filed an amended Q3 2022 10-Q, including its restated financial results, reflecting the goodwill impairment and its impact, and its 2022 10-K. The amended Q3 2022 10-Q and 2022-10-K disclosed the same financial results as the March 31, 2023, 8-K/A.

90.     The 2022 10-K also revealed material weaknesses regarding the Company's internal controls, stating in relevant part that "our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2022 due to material weaknesses in our internal control over financial reporting described below," continuing "[w]e did not maintain effective controls over information technology ("IT") for IT systems and applications that are relevant to the preparation of the consolidated financial statements." Further, Defendants stated, "[w]e did not maintain effective controls over the financial statement close and key business processes. Specifically, we did not consistently execute on our established accounting policies and procedures, and did not design, document and maintain controls to achieve complete, accurate and timely financial accounting, reporting and disclosures in accordance with GAAP." The Company continued "[t]hese include controls over account reconciliations, segregation of duties, review of journal entries and review of complex accounting matters. This deficiency resulted in a restatement of our unaudited condensed consolidated financial statements for the quarter and year-to-date period ended September 30, 2022."

91.     On this news, on the next trading day, Wheels Up's share price fell $0.072 per share, or 11.37%, to close at $0.5610 per share on April 3, 2023, damaging investors.

92.     As a direct and proximate cause of Defendants' wrongful acts and omissions, Plaintiff and other Class members have suffered significant losses and damages.

VII.   **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

93.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

94.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

95.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

96.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

98.    To establish reliance on a class wide-basis, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

99.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

100.    Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

101.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

**VIII.   COUNTS**

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and**

**SEC Rule 10b-5 Against All Defendants**

102.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.     This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

104.      During the Class Period, in violation of Rule 10b-5(b), Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

106.     Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents

36

would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

107.    The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

108.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

109.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would

not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

110.    As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiff and other members of the Class suffered damages in an amount to be established at trial.

111.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

**COUNT II**

**Form Violations of Section 20(a) of the Exchange Act**

**Against the Individual Defendants**

112.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

113.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

114.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

115.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

116.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## X.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 6, 2024

THE ROSEN LAW FIRM, P.A.

By: *Jacob A. Goldberg*
Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Philadelphia, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*