**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE LEE GOODMAN TRUST, Individually and on behalf of all others similarly situated, | Case No: 1:23-CV-02900 |
| Plaintiff, | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| WHEELS UP EXPERIENCE INC., KENNETH DICHTER, and TODD SMITH, | <u>CLASS ACTION</u> |
| Defendants. | |

Lead Plaintiff Scott Schleicher ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Amended Complaint against Defendants Wheels Up Experience Inc. ("Wheels Up" or "Company"), Kenneth Dichter ("Dichter"), and Todd Smith ("Smith"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wheels Up, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Wheels Up securities between November 9, 2022, and March 31, 2023,

inclusive ("Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 ("Exchange Act").

2.      Defendants recklessly or knowingly failed to impair goodwill by $62 million in their quarterly report for the period ended September 30, 2022 ("3Q22 10-Q"). Defendants knew that generally accepted accounting principles ("GAAP") required them to test goodwill for impairment annually, and more frequently when events they admit they monitored called for interim impairment analyses. Defendants told investors in the 3Q22 0-Q that they had evaluated goodwill for impairment as of September 30, 2022, falsely claiming to have found no "triggering events," which would have mandated they perform a quantitative analysis, and thus had not impaired goodwill.

3.      Indeed, during the relevant period, circumstances forced Defendants to focus intently on events triggering goodwill impairment testing. In June 2022, just months earlier, in response to a declining stock price and poor operating margins, a qualitative analysis caused Defendants to perform a quantitative analysis. Ultimately, Defendants informed investors, GAAP required no goodwill impairment as of June 1, 2022. The very circumstances that prompted Defendants' June 1, 2022, impairment testing, however, persisted. Defendants admit, therefore, that as of September 30, 2022, the existence of the most obvious of triggering event—the continuing decrease in Wheels Up's stock price—required them to perform the quantitative analysis. Further, other metrics Defendants monitored closely—rising interest rates, a rising discount rate, negative margins—existed as of September 30, 2022, compelling them to perform a quantitative goodwill impairment analysis and to impair the goodwill in the Company's legacy reporting unit. In the face of triggering events and qualitative factors requiring quantitative testing,

however, Defendants knowingly or reckless failed to perform quantitative testing that at that time required the Company to impair $62 million of goodwill as of September 30, 2022. Their failure caused them knowingly or recklessly to disclose materially false financial statements for 3Q22.

4.      In their May 3, 2024, memorandum of law in support of their motion to dismiss the earlier amended complaint ("MTD"), Defendants argued that goodwill is so complicated, requiring exercise of judgment, that they cannot be found liable for their failure to perform the quantitative analysis and to impair. The facts, however, belie Defendants' assertions. Defendants admit they paid attention to all of the factors necessitating an impairment. Stock price is not complicated. Margins are not complicated. Neither are interest rates or discount rates.

5.      Defendants' fraud allowed Wheels Up to present a more positive picture of the Company's financial condition than the truth would have shown. By failing to impair goodwill in 3Q22, Wheels Up understated Loss from Operations by 41%, Net Loss by 42%, and Loss per Share by 41%. Defendants' failure to perform a quantitative goodwill impairment test as of September 30, 2022, despite knowing the circumstances existed mandating an analysis, was severely reckless. On March 31, 2023, Defendants restated their 3Q22 financial statements, acknowledging that triggering factors existed as of September 30, 2022, requiring them to have performed a quantitative goodwill impairment test and to have impaired $62 million of goodwill in 3Q22.

6.      On their disclosure of the restatement, Wheels Up's stock price fell 11%, damaging investors.

## II.    JURISDICTION AND VENUE

7.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

10.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

11.    Plaintiff, as set forth in his previously filed certification, (Dkt. No. 14-2), incorporated by reference herein, purchased Wheels Up securities during the Class Period and was economically damaged thereby.

12.    Defendant Wheels Up Experience Inc. provides private aviation services in the United States and abroad. The company offers membership programs, charter, aircraft management, whole aircraft sales, and commercial travel services. It also provides freight, safety, and security solutions, as well as managed services. The company serves individuals, industry, government, and civil organizations. Defendant Wheels Up is incorporated in Delaware and its principal office is located at 601 West 26th Street, Suite 900, New York, New York, 10001.

Wheels Up securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "UP."

13.    Defendant Dichter founded the Company in 2013 and served as the Company's Chief Executive Officer ("CEO") from its inception and through the Class Period. Dichter also served as Chairman of the Board of Directors, and "chief operating decision maker." Wheels Up stated in the March 31, 2023, annual filing for the period ended December 31, 2022 ("2022 10-K") that Dichter "reviews our financial information presented on a consolidated basis." On May 9, 2023, Wheels Up announced that Dichter had resigned effective immediately as CEO and Chairman of the Board. Dichter signed and certified all quarterly and annual filings from 2021 through the end of the Class Period.

14.    Defendant Smith began serving as Wheels Up's Company's Chief Financial Officer ("CFO") on June 30, 2022, and served in that role throughout the Class Period. Smith signed and certified all quarterly and annual filings starting with the August 11, 2022 quarterly filing for the period ended June 30, 2022 ("2Q22 10-Q"), and through the entire Class Period.. On May 9, 2023, Smith became Interim CEO while remaining as CFO.

15.    Defendants Dichter and Smith are collectively referred to herein as the "Individual Defendants."

16.    Each of the Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

17.     For each quarterly and annual statement during the Class Period, Defendants Dichter and Smith signed Certifications stating that:

(a)     I have reviewed this annual report on Form [10-K or 10-Q] of Wheels Up Experience Inc.

(b)     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

(c)     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

(d)     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

1)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

2)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

3)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

4)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

18.      Further, in each quarterly and annual statement during the Class Period, Defendants Dichter and Smith signed SOX certifications stating that "To my knowledge, the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of and for the period covered by the Report."

19.      The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.      The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Wheels Up under *respondeat superior* and agency principles.

21.      Defendant Wheels Up and the Individual Defendants are collectively referred to herein as "Defendants."

IV.     **SUBSTANTIVE ALLEGATIONS**

A.     **Background**

22.     Aspirational Consumer Lifestyle Corp. ("Aspirational") was a Special Purpose Acquisition Company ("SPAC"), formed in September 2020 for the purpose of effecting a business combination.

23.     On February 1, 2021, Aspirational and Wheels Up reached an Agreement and Plan of Merger. On July 13, 20211, the merger was consummated. On July 14, 2021, shares of the combined business, called Wheels Up, began trading on the New York Stock exchange under the ticker symbol "UP."

24.     Defendant Dichter founded Wheels Up in 2013 to provide "on demand" private aviation in the United States. According to Defendants, the Company became one of the largest private aviation companies in the world. Wheels Up uses a membership/on-demand business model. Members can book private aircraft from the company fleet and third-party operators using a mobile application.

25.     In an April 1, 2022, press release, Wheels Up announced it had closed on its acquisition of Air Partner PLC ("Air Partner"), a U.K.-based global aviation services group with operations in 18 locations and across four continents. Wheels Up described Air Partner as "historically profitable."

26.     As of the closing date of the Company's Air Partner acquisition, Wheels Up established two separate reporting units for purposes of testing goodwill for impairment: Air Partner, for business outside of the North America., and the legacy Private Aviation Service ("Legacy"), for business in the North America. As Defendants disclosed in the 2022 10-K, "On April 1, 2022, we acquired Air Partner plc ('Air Partner') and determined that Air Partner represents a new reporting unit for the purposes of assessing potential impairment of goodwill, and

therefore the private aviation services operating segment was divided into two reporting units - Air Partner and the legacy Wheels Up reporting unit ('WUP Legacy')."

27.     On January 17, 2020, Wheels Up purchased Delta Private Jets, LLC ("DPJ"), a wholly owned Delta subsidiary, for a total purchase price of $427 million. In the 2021 10-K, Wheels Up allocated approximately $342.6 million of that purchase price as goodwill. Thus, the large majority of the goodwill allocated to Wheels Up Legacy during the Class Period was attributable to the DPJ acquisition.

28.     Following the DPJ acquisition, according to the 2021 10-K, Delta was a "significant minority stockholder" in Wheels Up. As of December 31, 2021, Delta owned 21.3% of Wheels Up's outstanding common stock. Pursuant to the February 1, 2021, "Delta Investor Rights Letter," Delta also had the right to designate two members of Wheels Up's eleven-member board of directors. Delta is a "related party" to Wheels Up. Indeed, during the period relevant to these allegations, Delta's board appointees included Dwight James, Senior Vice President at Delta, responsible for the company's Customer Engagement and Loyalty and serves as the CEO of Delta Vacations, a wholly owned global subsidiary of Delta, and Erik Snell, Senior Vice President—Operations & Customer Center (OCC), Operations Analytics and Subsidiary Airlines for Delta.

29.     Wheels Up stated that it acquired DPJ because "it provides management of aircraft on behalf of third-party owners and provides full service and in-house maintenance capabilities." As part of the acquisition, "we also executed an exclusive long-term commercial cooperation agreement with Delta." Further, Wheels Up stated in the 23021 10-K that "our strategic relationship with Delta provides exposure to high-value Delta individual and corporate customers through co-marketing products, features and benefits."

30.    Concurrent with the DPJ purchase, Wheels Up and Delta entered into a "Registration Rights Agreement," entitling Delta prompt registration of its Wheels Up shares in the future. On August 10, 2022, during 3Q2022, Wheels Up registered over 193 million shares of Wheels Up Class A common stock, including approximately 54 million shares Delta owned shares and 23 million shares that Defendant Dichter owned and/or controlled.

**B.    Generally Accepted Accounting Principles**

31.    Generally Accepted Accounting Principles ("GAAP") are a common set of accounting principles, conventions, standards, and procedures recognized by the accounting profession as defining the accepted accounting practices at a particular time. Companies in the United States use GAAP to prepare their financial statements.

32.    The SEC has the statutory authority for the promulgation of GAAP for public companies, and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The SEC Rules and interpretive releases, and the FASB Accounting Standards Codification ("ASC"), represent sources of authoritative GAAP for SEC registrants. ASC 105-10-05-1. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that SEC-filed financial statements which are not prepared in accordance with GAAP are presumed to be misleading and inaccurate, despite footnotes or other disclosures, unless the SEC has otherwise provided.

**1.    Accounting for Goodwill**

33.    ASC 350-20 addresses the application of GAAP to accounting and financial reporting for goodwill. Goodwill is defined as "an asset representing the future economic benefits arising from other assets acquired in a business combination." ASC 350-20-20. Goodwill is created in an acquisition and is initially measured as the excess of the purchase price over the value of identifiable assets acquired and liabilities assumed in a business combination. ASC 805-30-30-1.

34.     Goodwill is not amortized but is instead tested for impairment at the reporting unit level. ASC 350-20-35-1. "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value." ASC 350-20-35-2. A "reporting unit is an operating segment or one level below an operating segment (also known as a component)." ASC 350-20-20. "A component of an operating segment is a reporting unit if the component constitutes a business or a nonprofit activity for which discrete financial information is available and segment management … regularly reviews the operating results of that component." ASC 350-20-35-34. An entity which determines that it has one segment, "is nonetheless required to test goodwill for impairment at the reporting unit level." ASC 350-20-35-38. All goodwill acquired in a business combination is required to be assigned to one or more reporting units, as of the acquisition date, for the purpose of testing goodwill for impairment. ASC 350-20-35-41.

35.     Following the Air Partner acquisition, Wheels Up recognized Legacy and Air Partner as separate reporting units for the purposes of assessing impairment of goodwill, stating in the 2022 10-K that "[o]n April 1, 2022, we acquired Air Partner … and determined that Air Partner represents a new reporting unit for the purposes of assessing potential impairment of goodwill," continuing "and therefore the private aviation services operating segment was divided into two reporting units - Air Partner and the legacy Wheels Up reporting unit." Therefore, Wheels Up was required to separately test goodwill associated with each reporting unit, Legacy and Air Partner.

36.     Once a year, at the same time each year on a date of a company's choosing, a company must evaluate goodwill for impairment. ASC 350-20-35-28. Wheels Up elected to conduct its annual impairment tests as of October 1st of each year.

11

37.     GAAP requires that the "goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30.

38.     GAAP contains the following examples of events and circumstances, **triggering events**, which could trigger an interim goodwill impairment test:

(a)     Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets.

(b)     Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development.

(c)     Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows.

(d)     **Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods.**

(e)     Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation.

(f)     Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, **the testing for recoverability of a significant asset group within a reporting unit**, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

(g)     **If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).**[1]

---

[1] Emphasis added unless otherwise noted.

ASC 350-20-35-3C.

39.    The above list is not all-inclusive. The SEC staff provided the following additional examples for management to consider as potential triggers for an interim goodwill impairment test:

      (a)    Other impairment charges or valuation allowances.

      (b)    Recent cash or operating losses for reporting unit due to market conditions with expectation they may continue.

      (c)    Weakness in particular industry (e.g., airlines, auto, banks, retail, etc.).

      (d)    Inability to meet quarterly expectations or downward revisions to forecasts for future periods.

      (e)    Restructuring Plans (e.g., Store Closures, Layoffs, etc.).

      (f)    **Decline in market capitalization below book value**.

           (1)    External market events on sector/industry. Is discount, decline, or volatility greater than market?

           (2)    Short-term spikes in short selling.

           (3)    Above factors should be considered in light of duration and severity of difference.[2]

40.    When evaluating whether triggering events have occurred, "[a]n entity shall evaluate, on the basis of the weight of evidence, the significance of all identified events and circumstances in the context of determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount." ASC 350-20-35-3G. Further, GAAP requires management to consider other relevant events and circumstances that affect the fair value of the

---

[2] National Conference on Current SEC & PCAOB Developments - December 9, 2008 (https://www.sec.gov/news/speech/2008/spch120908wc-slides.pdf).

reporting unit and may affect the comparison of the reporting unit's fair value with its carrying value:

> [A]n entity shall consider other relevant events and circumstances that affect the fair value or carrying amount of a reporting unit … . An entity shall consider the extent to which each of the adverse events and circumstances identified could affect the comparison of a reporting unit's fair value with its carrying amount. An entity should place more weight on the events and circumstances that most affect a reporting unit's fair value or the carrying amount of its net assets. An entity also should consider positive and mitigating events and circumstances that may affect its determination of whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If an entity has a recent fair value calculation for a reporting unit, it also should include as a factor in its consideration the difference between the fair value and the carrying amount in reaching its conclusion about whether to perform the quantitative goodwill impairment test. ASC 350-20-35-3F.

41.     A goodwill impairment test consists of a qualitative and a quantitative assessment. The qualitative assessment acts as a screen to determine if it is necessary to perform the quantitative test. A Company has an option to first perform (or bypass) a qualitative assessment of goodwill to determine whether it is necessary to perform the quantitative goodwill impairment test. ASC 350-20-35-3 – 3B. The events and circumstances to consider in performing a qualitative analysis are the same as the aforementioned events and circumstances which could trigger an interim goodwill impairment test. ASC 350-20-35-3C and ASC 350-20-35-30. Moreover, the process for making these evaluations is also identical. ASC 350-20-35-3F through 35-3G and ASC 350-20-35-30.

42.     If, after assessing the totality of events or circumstances, an entity determines that it is more likely than not (that is, a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, then it must perform a quantitative goodwill impairment test. ASC 350-20-35-3E However, if "an entity determines that it is not more likely

than not that the fair value of a reporting unit is less than its carrying amount, then the quantitative goodwill impairment test is unnecessary.". ASC 350-20-35-3D.

43.     Based on the above guidance, it is not possible to conclude that an interim goodwill impairment test is required but a quantitative goodwill impairment test is unnecessary. Similarly, a failure to identify triggering events, or falsely conclude that triggering events do not exist, would cause an entity to arrive at an erroneous conclusion that an interim quantitative goodwill impairment test is unnecessary.

44.     "The quantitative goodwill impairment test, used to identify both the existence of impairment and the amount of impairment loss, compares the fair value of a reporting unit with its carrying amount, including goodwill." ASC 350-20-35-4. If the carrying amount (i.e., the amount recorded on the books) exceeds the fair value of the reporting unit, then goodwill is considered impaired and an impairment loss is recognized in an amount equal to that excess, up to the amount of goodwill allocated to that reporting unit. ASC 350-20-35-8.

45.     For each reporting period, a company is required to disclose changes in the carrying amount of goodwill during the period. "If any portion of goodwill has not yet been allocated to a reporting unit at the date the financial statements are issued, that unallocated amount and the reasons for not allocating that amount shall be disclosed." ASC 350-20-50-1. Moreover, the following disclosures are required for "each goodwill impairment loss recognized:"

    a.      A description of the facts and circumstances leading to the impairment

    b.      The amount of the impairment loss and the method of determining the fair value of the associated reporting unit (whether based on quoted market prices, prices of comparable businesses or nonprofit activities, a present value or other valuation technique, or a combination thereof)

15

c.      If a recognized impairment loss is an estimate that has not yet been finalized …, that fact and the reasons therefore and, in subsequent periods, the nature and amount of any significant adjustments made to the initial estimate of the impairment loss.

ASC 350-20-50-2.

### 2.      Accounting for long-lived assets

46.      According to Wheels Up, its long-lived assets "include aircraft, property and equipment, finite-lived intangible assets and operating lease right-of-use assets." ASC 360, *Property, Plant, and Equipment*, provides guidance for accounting and reporting of long-lived assets, including recognition and measurement of impairment of long-lived assets to be held and used.[3] Unlike goodwill, long-lived assets are depreciated over their useful lives and are not required to be tested for impairment on an annual basis.[4] ASC 360-10-35-2 – 35-4 and ASC 360-10-35-21. Also unlike goodwill, an impairment loss of a long-lived asset is only recognized when the carrying amount of a long-lived asset is not recoverable and exceeds its fair value. "The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group). … An impairment loss shall be measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value." ASC 360-10-35-17.

---

[3] Finite-lived intangible assets subject to amortization are reviewed for impairment in accordance with the guidance for property, plant, and equipment contained in ASC 360. ASC 350-30-35-14. Similarly, right-of-use assets, which are assets that represents a lessee's right to use underlying assets for the lease term, are amortized and reviewed for impairment in accordance with the guidance for property, plant, and equipment contained in ASC 360. ASC 842-20-35-9 – 35-10.

[4] Finite-lived intangible assets and operating lease right-of-use assets are amortized rather than depreciated. ASC 350-30-35-1, ASC 842-20-25-7 – 25-8 and ASC 842-20-35-10.

47.    Long-lived assets are tested for recoverability only if there are indicators that an asset's carrying amount may not be recoverable:

> A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable. The following are examples of such events or changes in circumstances:
>
> a.    A significant decrease in the market price of a long-lived asset (asset group)
>
> b.    A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition
>
> c.    A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator
>
> d.    An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)
>
> e.    A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)
>
> f.    A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly

before the end of its previously estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent.

ASC 360-10-35-21

48.     "If goodwill and another asset (or asset group) of a reporting unit are tested for impairment at the same time, the other asset (or asset group) shall be tested for impairment before goodwill." ASC 350-20-35-31.

**C.     Wheels Up's Goodwill Impairment Analyses Policies and Practices**

49.     In its Annual report for the period ended December 31, 2021 ("2021 10-K"), with respect to goodwill, Wheels Up disclosed:

Goodwill and Intangibles

Goodwill represents the excess of the consideration transferred over the fair value of the identifiable assets acquired and liabilities assumed in business combinations. The carrying value of goodwill is tested for impairment on an annual basis or on an interim basis if events or changes in circumstances indicate that an impairment loss may have occurred (i.e., a triggering event). **Our annual goodwill impairment testing date is October 1st.** We are required to test goodwill on a reporting unit basis. We determined private aviation services is our one reporting unit to which the entire amount of goodwill is allocated.

Goodwill impairment is the amount by which our reporting unit's carrying value exceeds its fair value, not to exceed the carrying value of goodwill. We use both qualitative and quantitative approaches when testing goodwill for impairment. Our qualitative approach evaluates various events including, but not limited to, macroeconomic conditions, changes in the business environment in which we operate, a sustained decrease in our share price and other specific facts and circumstances. If, after assessing qualitative factors, we determine that it is more-likely-than-not that the fair value of our reporting unit is greater than the carrying value, then performing a quantitative impairment assessment is unnecessary and our goodwill is not considered to be impaired. However, if based on the qualitative assessment we conclude that it is more-likely-

than-not that the fair value of the reporting unit is less than the carrying value, or if we elect to skip the optional qualitative assessment approach, we proceed with performing the quantitative impairment assessment, to quantify the amount of impairment, if any.

**When a quantitative impairment assessment is performed, we primarily determine the fair value of our reporting unit using a discounted cash flow model, or income approach,** and supplement this with observable valuation multiples for comparable companies, as appropriate. **The completion of the discounted cash flow model requires that we make a number of significant estimates and assumptions, which include projections of future revenue, costs and expenses, capital expenditures and working capital changes, as well as assumptions about the estimated weighted average cost of capital and other relevant variables. We base our estimates and assumptions on our recent performance, our expectations of future performance, economic or market conditions and other assumptions we believe to be reasonable.** Actual future results may differ from those estimates.

50.     Wheels Up also acknowledged that the Company's quantitative goodwill impairment assessment using discounted cash flows (or income) approach is highly sensitive to key assumptions, such as changes in future expected cash flows and rises in interest rates and, therefore, Defendants monitored changes in these conditions in evaluating whether triggering events had occurred:

Quantitative impairment assessments are sensitive to key assumptions, such as **expected future cash flows, the degree of volatility in equity and debt markets, and our stock price**. If the assumptions used in our assessments are not realized, or such assumptions change due to a change in business or market conditions impacting **our forecasts**, **rises in interest rates** that impact our estimate of weighted average cost of capital, or if the **trading price of our Class A common stock** declines significantly from historical levels, it is possible that an additional impairment charge for tangible or intangible assets, including goodwill, may need to be recorded in the future, including as result of the effects of factors outside our control on our flight schedules and business.

51.     In its 2021 10-K, the Company disclosed that it had performed the required goodwill impairment analyses on both October 1, 2019, and October 1, 2020, as well as interim

impairment tests on April 30, 2020 and December 15, 2021, due to the presence of triggering

events, using the discounted cash flow approach, which did not result in impairment of goodwill.

Notably, the Company disclosed the types of tests carried out (qualitative or quantitative), the "as

of" date of each test, and the outcome of each test:

> On October 1, 2019, we performed a qualitative annual assessment of goodwill, and determined that there were no indicators of impairment. Our qualitative assessment included analyses and weighting of all relevant factors that impact the fair value of our goodwill.
>
> During 2020, due to the initial negative effect of COVID-19 on overall travel demand and our business, as well as the uncertainty in anticipated versus actual rates of recovery, in addition to our annual goodwill impairment assessment on October 1st, we deemed it necessary to perform an interim quantitative impairment assessment of goodwill on April 30, 2020, using the **estimated future discounted cash flows of our reporting unit,** which did not result in impairment to goodwill. We performed a qualitative annual assessment on October 1, 2020, as the estimated fair value of our reporting unit significantly exceeded the carrying value on April 30, 2020. Our qualitative assessment did not result in an indication that the fair value of our reporting unit was less than the carrying value.
>
> We performed a quantitative annual assessment on October 1, 2021. Our quantitative assessment, using a discounted cash flow approach did not result in an indication that the fair value of our reporting unit was less than the carrying value. During the fourth quarter of 2021, we determined that **because of a sustained decrease in our share price from the Closing Date, combined with a decline in our margins, there was an indication a triggering event occurred.** As such, we deemed it necessary to perform an interim quantitative impairment assessment of goodwill on December 15, 2021, **using a discounted cash flow approach,** which did not result in impairment to goodwill.

52.    Defendants included in the 2021 10-K, the audit opinion of the Company's

independent auditor, Grant Thornton's. Grant Thornton disclosed the following "critical audit

matter" that it communicated to Wheels Up's Audit Committee:

*Goodwill*

[T]he Company performed a goodwill impairment assessment as of October 1, 2021, the date of its annual impairment test, and again as of December 15, 2021 **due to the presence of certain indicators resulting in a triggering event.** We identified the Company's goodwill impairment assessment as a critical audit matter.

The principal considerations for our determination that this is a critical audit matter are the **significant management estimates and judgments required to assess the reporting unit's fair value, which include the determination of discount rates, revenue growth rates, margins, and other projected long-term rates.** Auditing these estimates and assumptions requires a high degree of auditor judgment.

Our audit procedures related to the goodwill impairment testing included the following, among others:

•**We evaluated management's identification of triggering events, which included consideration of current market conditions**.

•We evaluated management's revenue growth rates, margins, and cash flows for consistency with relevant historical data, recent changes in the business, and external industry data and forecasts.

•With the assistance of our valuation professionals with specialized skills and knowledge, we evaluated the valuation methodologies, inputs, and assumptions utilized by management.

•We performed sensitivity analyses on the future revenue, long-term growth rates, margins, and discount rates used to evaluate the impact changes in these assumptions have on management's conclusion.

•We tested management's reconciliation of the carrying value of the Company to its market value.

53.     Defendants subsequently acknowledged that as a result of its Air Partner acquisition on April 1, 2022, Wheels Up recognized Legacy and Air Partner as separate reporting units for the purposes of assessing impairment of goodwill:

On April 1, 2022, we acquired Air Partner plc ("Air Partner") and determined that Air Partner represents a new reporting unit for the purposes of assessing potential impairment of goodwill, and therefore the private aviation services operating segment was

21

divided into two reporting units - Air Partner and the legacy Wheels Up reporting unit ("WUP Legacy").

**1.    The 2021 10-K Establishes the Company's Practice for Annual Goodwill Impairment Testing and the Need to Perform Interim Impairment Testing When Necessary**

54.    Defendant Dichter signed and certified the 2021 10-K. Its language, too, manifests his actual knowledge of Wheels Up's goodwill impairment testing, both process and substance, including the circumstances that should cause interim impairment testing. The 2021 10-K disclosed that:

> We performed a quantitative annual assessment on October 1, 2021. Our quantitative assessment … us[ed] a discounted cash flow approach…. During the fourth quarter of 2021, we determined that because of a sustained decrease in our share price from the Closing Date, combined with a decline in our margins, there was an indication a triggering event occurred. As such, we deemed it necessary to perform an interim quantitative impairment assessment of goodwill on December 15, 2021, using a discounted cash flow approach ….

55.    This disclosure indicates that Dichter had actual knowledge of both the goodwill impairment testing process, and of the substantive circumstances that should cause them to perform an interim quantitative impairment test and under what circumstances actually to impair for both interim testing and annual testing. Further, it establishes that Dichter tracked, on an ongoing basis, both Wheels Up's stock price and its operating margins.

**2.    2Q22 Goodwill Interim Impairment Testing**

56.    During 2022, the price of Wheels Up common stock continued to decline, falling 38% from $4.19 on December 15, 2021 (the date of the last goodwill impairment test) to $2.60 on June 1, 2022. Together with a "further decline in [the Company's] operating margins," Defendants deemed the continued decline in the price of the Company's common stock to be a triggering event, which required the Company to test its long-lived assets for recoverability. Even

though goodwill is never tested for recoverability (a test reserved solely for long-lived assets), Defendants also inexplicably concluded that the carrying value of the Company's goodwill may not be "recoverable" and performed an interim quantitative goodwill impairment test. Although, as stated above, testing for recoverability of a significant asset group within a reporting unit may constitute a triggering event, on the face of its disclosure, the Company regarded a sustained decrease in the quoted market price of its common stock, as well as the further decline in its operating margins, as triggering events "that would more likely than not reduce the fair value of a reporting unit below its carrying amount" requiring the Company to perform an interim goodwill impairment test:[5]

> During the second quarter of 2022, we determined that **because of a sustained decrease in the quoted market price of our Class A common stock from the Closing Date, combined with a further decline in our operating margins,** there was an indication that a triggering event occurred and the carrying value of our long-lived assets and goodwill may not be recoverable. As a result, we performed an undiscounted cash flow analysis of our long-lived assets for potential impairment as of June 1, 2022, and based on the analysis, it was determined that there was no impairment to our long-lived assets. **In addition, we performed an interim quantitative impairment assessment of goodwill on June 1, 2022, using a discounted cash flow approach,** which did not result in impairment to goodwill.

57.    In violation of GAAP, Wheels Up failed to disclose that its June 1, 2022, goodwill impairment test involved the Legacy reporting unit only and not goodwill for the entire company, including the Air Partner reporting unit. Wheels Up , however, admitted this fact in its amended and restated quarterly report for the period ended September 30, 2022 ("3Q22 10-Q/A"), stating:

---

[5] In their MTD, Defendants affirmatively state that the Company's interim quantitative goodwill impairment test was prompted by a "sustained decrease in quoted market price of [Wheels Up's] Class A common stock . . . combined with a further decline in [] operating margins." MTD at 8.

During the second quarter of 2022, we determined that because of a sustained decrease in the quoted market price of our Class A common stock, par value $0.0001 per share ("Class A common stock"), from the Closing Date, combined with a further decline in our operating margins, there was an indication that a triggering event occurred and the carrying value of our long-lived assets and goodwill may not be recoverable associated with **the legacy Wheels Up reporting unit ("WUP Legacy").** As a result, we performed an undiscounted cash flow analysis of our long-lived assets for potential impairment as of June 1, 2022, and based on the analysis, it was determined that there was no impairment to our long-lived assets. In addition, **we performed an interim quantitative impairment assessment of goodwill on June 1, 2022, using a discounted cash flow approach**, which did not result in impairment to goodwill.

58.     The Company's disclosures make it clear that, when it performs a quantitative goodwill impairment assessment, it employs a discounted cash flow model (or income approach) which utilizes, and is highly sensitive to changes in, estimates and assumptions related to future cash flows and interest rates, among others. The use of a discount rate to determine the present value of future cash flows is, by definition, the foundation of a discounted cash flow analysis. Consequently, changes in the discount rate, even in the absence of any other changes, always have an impact on the results of a discounted cash flow analysis. Defendants' inputs into their quantitative goodwill impairment analysis are unknown to investors such that investors cannot recreate that quantitative goodwill impairment analysis in which GAAP required Defendants engage.[6]

59.     Defendants Dichter and Smith signed and certified the originally filed 2Q22 10-Q, disclosing that during 2Q22, Defendants had performed an interim quantitative goodwill impairment test as of June 1, 2022. This disclosure indicates, therefore, that both Dichter and

---

[6] For example, Defendants do not disclose, and investors do not know, the future cash flows the Defendants forecast, including future revenues and margins, working capital requirements, the Company's weighted average cost of capital ("WACC")—how the Company will raise money and on what terms—or the discount rate it applies.

Smith each had actual knowledge of both the goodwill impairment testing process, and of the substantive circumstances that should have caused them to perform an interim quantitative impairment test and under what circumstances actually to impair for both interim testing and annual testing. In addition, this disclosure establishes that Dichter and Smith tracked, on an ongoing basis, both Wheels Up's stock price, operating margins, and the metrics, including changes in the discount rate, that had caused Wheels Up to perform quantitative impairment testing on June 1, 2022 and that ultimately caused it to restate the Company's 3Q22 results, impairing goodwill by $62 million.

### 3. 3Q22's Rising Interest Rates, Stock Price Decline, and Sustained Negative Margins

60.     When testing goodwill for impairment using the discounted cash flows approach, a company typically develops detailed cash flows projections for the next five to ten years and then assumes a constant growth rate in perpetuity thereafter. A discounted cash flows analysis calculates the present value of the future cash flows using a discount rate. A discount rate is usually developed by building from (or adding onto) a risk free rate for U.S. treasury securities. Because a detailed forecast period is typically between five to ten years, discounted cash flows analyses typically use the five or ten year treasury rates.

61.     After keeping the Federal Funds Rate at near zero to address the fallout from the COVID-19 pandemic, beginning in March 2022, the Federal Reserve began aggressively increasing Federal Funds Rate to counter inflation. Through the third quarter 2022, Federal Reserve raised interest rates five times by a total of 3.0%:[7]

---

[7] Source: https://www.forbes.com/advisor/investing/fed-funds-rate-history/

**Fed Rate Hikes 2022-2023: Taming Inflation**

| FOMC Meeting Date | Rate Change (bps) | Federal Funds Rate |
|---|---|---|
| July 26, 2023 | +25 | 5.25% to 5.50% |
| May 3, 2023 | +25 | 5.00% to 5.25% |
| March 22, 2023 | +25 | 4.75% to 5.00% |
| Feb 1, 2023 | +25 | 4.50% to 4.75% |
| Dec 14, 2022 | +50 | 4.25% to 4.50% |
| Nov 2, 2022 | +75 | 3.75% to 4.00% |
| Sept 21, 2022 | +75 | 3.00% to 3.25% |
| July 27, 2022 | +75 | 2.25% to 2.50% |
| June 16, 2022 | +75 | 1.50% to 1.75% |
| May 5, 2022 | +50 | 0.75% to 1.00% |
| March 17, 2022 | +25 | 0.25% to 0.50% |

62.     Between June 1, 2022, (the date of the last quantitative goodwill impairment test) and September 30, 2022, the Federal Funds Rate more than tripled. As shown below, the five and ten year daily treasury yields also significantly increased during the same time period. The five-year treasury yield increased 38% from 2.94% on June 1, 2022, to 4.06% on September 30, 2022, and the 10-year treasury yield increased 30% from 2.94% on June 1, 2022, to 3.83% on September 30, 2022:[8]

[REST OF PAGE INTENTIONALLY BLANK]

---

[8] Source: U.S. Department of the Treasury - Daily Treasury Par Yield Curve Rates (https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value=2022).



63.     Having disclosed their knowledge of triggering events and of their choice to employ a discounted cash flows analyses to perform a quantitative goodwill impairment test, Defendants knew about these significant interest rate increases. As stated above, Defendants acknowledge that the Company's goodwill quantitative impairment assessments were sensitive to rises in interest rates. Defendants, therefore, monitored changes in the discount rate and evaluated whether these changes constituted triggering events for purposes of performing an interim quantitative goodwill impairment test.

64.     Because discounted cash flows analysis includes assumptions related to future cashflows based, in part, on future operating margins, discount rates, and cost of capital, among other assumptions, investors did not have the required information to analyze the Company's goodwill for impairment or to evaluate Defendants' false representations that the observable changes in the price of the Company's common stock or the current operating margins did not constitute triggering events requiring interim quantitative goodwill impairment testing.

65.    As the 2022 Form 10-K details, during 3Q22, Wheels Up continued to experience a decline in its stock performance, at a much greater magnitude than a broader industry decline. In the 2022 10-K, Wheels Up included the following chart:



66.    Between June 1, 2022, (the date of the last quantitative goodwill impairment test) and September 30, 2022, the price of Wheels Up's common stock dropped an additional 56% from $2.60 to $1.45, thus prolonging the sustained decline in the price of the Company's common stock. The magnitude of the stock price decline from the last quantitative test (June 1, 2022) to September 30, 2022 was much greater than the 38% decline from December 15, 2021 to June 1, 2022, which had caused Wheels Up to perform an interim quantitative goodwill impairment test as of June 1, 2022.

67.    Moreover, as a result of the stock price decline, Wheels Up's market capitalization (calculated as the market price per common share multiplied by the number of common shares outstanding) declined 40.7% during 3Q22 (from $476.3m to $282.6m), which more than doubled the gap (or the shortfall) between the carrying value of the Company's equity and the market capitalization (from approximately $106.4 million to $226.8 million).

68.    These conditions, combined with the increase in the discount rate Defendants knew they used in the quantitative analysis, should have caused Wheels Up to recognize the occurrence of triggering events during 3Q22 and to perform an interim quantitative goodwill impairment test. Through the restatement, Defendants admit that these factors existed as of September 30, 2022, and that they knew it or were severely reckless in disregarding it.

69.    As noted above, both Dichter and Smith signed and certified the 2Q22 10-Q and had actual knowledge of both the goodwill impairment testing process, and of the substantive circumstances that should have caused them to perform an interim impairment test and under what circumstances actually to impair for both interim testing and annual testing. As such, with respect to 3Q22, both Smith and Dichter had actual knowledge of both process and substance relating to impairment that Defendants have conceded should have caused them to impair as of September 30, 2022.

70.    Wheels Up also continued to experience negative operating margins, more than 20% in the negative each quarter after the business combination with Aspirational:



71.    Even though the operating margin had improved from 1Q22 to 2Q22, Defendants still determined that the Company's operating margins experienced "a further decline" as of June 1, 2022, which they deemed to be a triggering event for interim quantitative goodwill impairment testing. Yet, Defendants did not identify a relatively constant negative profit margin during 3Q22 as a triggering event.

72.    As noted above, both Smith and Dichter had actual knowledge of both process and substance relating to quantitative impairment testing. Both tracked margins, and knew that, quarter after quarter, operating margins were negative, and worse than 20% negative each quarter. Since Defendants have conceded that the stock price decrease alone mandated performance of a quantitative interim goodwill analysis as of September 30, 2022, Defendants should have impaired goodwill as of September 30, 2022.

73.    Materially misrepresenting the value of its goodwill as of September 30, 2022, however, in its November 9, 2022, 3Q22 10-Q, Defendants disclosed that they did not perform an interim quantitative goodwill impairment test due to lack of triggering events during the quarter, stating:

> During the second quarter of 2022, we determined that because of a sustained decrease in the quoted market price of our Class A common stock from the Closing Date, combined with a further decline in our operating margins, there was an indication that a **triggering event occurred and the carrying value of our long-lived assets and goodwill may not be recoverable.** As a result, we performed an undiscounted cash flow analysis of our long-lived assets for potential impairment as of June 1, 2022, and based on the analysis, it was determined that there was no impairment to our long-lived assets. In addition, we performed an interim quantitative impairment assessment of goodwill on June 1, 2022, using a discounted cash flow approach, which did not result in impairment to goodwill. **There were no changes in circumstances or events which indicated a triggering event occurred or that the carrying value of our long-lived assets and goodwill may not be recoverable as of September 30, 2022**.

74.     In their MTD Defendants erroneously claim that the foregoing paragraph from the 3Q22 10-Q discloses "the results of its qualitative assessment using an 'as of' date of September 30, 2022" and that its assessment, purportedly carried out by weighing "all required factors pursuant to ASC 350-20-35-3A through 35-3G … led to a determination that a quantitative test was not needed for Q3."[9] The very text of its disclosure, however, defies that meaning. First, as stated above, Defendants tested goodwill for recoverability. Goodwill is never tested for recoverability, which is a test reserved solely for long-lived assets.

75.     Therefore, in evaluating whether triggering events occurred as of September 30, 2022, the Company apparently used the wrong criteria (*recoverability* under ASC 360-10-35 rather than *the likelihood of fair value of the Legacy reporting unit being reduced below its carrying amount* as required by ASC 350-20-35). Because Wheels Up applied the guidance for long-lived assets rather than goodwill, its analysis of triggering events and the need to perform an interim quantitative goodwill impairment test as of September 30, 2022, was inconsistent with ASC 350-20-35-3A through 35-3G, which Defendants argue they followed. More, the Company's statement in the 3Q22 10-Q did not include the customary disclosures that would be present if the Company had actually performed a goodwill impairment test such as the disclosures it made in the 2021 10-K in connection with its previous goodwill impairment tests. The 3Q22 10-Q did not disclose (a) the actual "as of" date, (b) whether the Company performed a qualitative or a quantitative test, (c) the results of the supposedly performed interim impairment test, or (d) the Company's conclusion that a quantitative test was not needed.

---

[9] *See* MTD at 8.

76.    On March 31, 2023, however, restating the Company's 3Q22 financials, Defendants admitted that the very triggering events they had tracked or should have tracked closely since no later than June 1, 2022, including decreasing stock price, negative operating margins, rising interest rates, and a rise in discount rate) existed as of September 30, 2022, and Defendants should have both performed interim quantitative goodwill impairment testing and impaired goodwill materially. They stated in the 3Q22 10-Q/A that:

> **During the third quarter of 2022, we determined that because of continued deterioration in our stock price, resulting in a market capitalization that was below the carrying value of our equity, there was an indication that a triggering event occurred and the carrying value of [] Legacy may not be recoverable.** As a result, we performed a quantitative impairment test using the income approach. The fair value using the income approach was based on the present value of estimated future cash flows. The significant underlying unobservable inputs used to measure the fair value included forecasted revenue growth rates and margins, weighted average cost of capital, normalized working capital level and projected long-term growth rates. **As a result of this assessment, a goodwill impairment charge of $62.0 million was recorded to [] Legacy as of September 30, 2022**. **The decline in the fair value of the reporting unit, as compared to the quantitative analysis performed as of June 1, 2022, was primarily due to an increase in the discount rate**.

**4.    Defendants' Failure to Impair Goodwill as of September 30, 2022, was Minimally Severely Reckless**

77.    GAAP required Wheels Up to perform annual goodwill impairment testing on the same date each year or more frequently upon the occurrence of triggering events.

78.    Defendants Dichter and Smith both tracked the Company's stock price and operating margins and were aware of the sensitivity of the goodwill impairment tests to changes in other estimates and assumptions, such as the discount rate. Both signed and certified quarterly and annual filings, even before the start of the Class Period, indicating their knowledge of

goodwill impairment testing and substance, including circumstances that would cause interim quantitative impairment testing.

79.     In announcing the 3Q22 impairment in the 2022 10-K, Wheels Up admitted that it had only belatedly performed quantitative impairment testing of the Legacy reporting unit as of September 30, 2022, and concluded that date was so close to October 1, its annual impairment testing date, that there was "no additional impairment as of October 1, 2022."

80.     Defendants, however, did not perform the interim quantitative goodwill impairment analysis as of September 30, 2022, as circumstances required it to do.

81.     Given their actual knowledge of the timing, process, and substance of the Company's impairment testing, Defendants' failure to perform the required October 1, 2022, annual impairment test was severely reckless.

### D.     The Meaning of a GAAP Restatement

82.     ASC Topic 250, Accounting *Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes, and defines an error as

> an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error. ASC 250-10-20.

83.     ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

a)   The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

b)   An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

c)   Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error." ASC 250-10-45-23.

84.    ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented." ASC 250-10-50-7.

85.    In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors …concludes that any previously issued financial statements …should no longer be relied upon because of an error in such financial statements." Wheels Up made these required disclosures in its March 31, 2023 Form 8-K/A.

86.    Such disclosure of non-reliance on previously issued financial statements is associated with what is colloquially called by the accounting profession a "Big R restatement." A Big R restatement occurs when the error is *material* to the prior period financial statements. The evaluation of the materiality of a misstatement or omission in financial statements is viewed from the standpoint of a reasonable person and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements. SAB 99. When an error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon.

87.    When Wheels Up restated its 3Q22 financial results, it acknowledged the material falsity of its financial results, including the notes to the financial statements Defendants disclosed and included in the Company's 3Q22 10-Q.

## V.    FALSE AND MISLEADING STATEMENTS AND OMISSIONS

88.    On November 9, 2022, Wheels Up filed its 3Q22 10-Q, issuing a press release discussing 3Q22 unaudited financial results. The Company reported a net loss of $86,838,000 for the three months ended September 30, 2022 and $268,637,000 for the nine months ended September 30, 2022. The Company also reported goodwill of $521,847,000, with no goodwill impairment, and total equity of $509,435,000 as of September 30, 2022.

89.    Defendants admit that the foregoing statements about the Company's financial results were materially misleading. In the restatement in the 3Q22 10-Q/A, Defendants stated in the present tense that "[d]uring the third quarter of 2022, we determined that because of continued deterioration in our stock price, resulting in a market capitalization that was below the carrying value of our equity, there was an indication that a triggering event occurred and the carrying value of WUP Legacy may not be recoverable." Defendants further admitted that the financial statements in the originally filed 3Q22 10-Q were materially false. Therefore, in violation of GAAP, Defendants knew or recklessly disregarded that:

(a)    The 3Q22 financials it disclosed on November 9, 2022, were materially false;

(b)    On its balance sheet, Wheels Up failed to record a goodwill impairment, overstating goodwill by $62 million and total equity by $62 million;

(c)    On its income statement, for the three months ended September 30, 2022, Wheels Up understated goodwill impairment by $62 million, understated loss from

operations by $62 million, understated net loss by $62 million, and understated loss per share by $0.25, or 41%;

(d)    On its income statement, for the nine months ended September 30, 2022, Wheels Up understated goodwill impairment by $62 million, understated loss from operations by $62 million, understated net loss by $62 million, and understated loss per share by $0.25.

90.    Also, in the 3Q22 10-Q, with respect to impairment testing, Defendants stated:

Interim Impairment Test

During the second quarter of 2022, we determined that because of a sustained decrease in the quoted market price of our Class A common stock from the Closing Date, combined with a further decline in our operating margins, there was an indication that a triggering event occurred and the carrying value of our long-lived assets and goodwill may not be recoverable. As a result, we performed an undiscounted cash flow analysis of our long-lived assets for potential impairment as of June 1, 2022, and based on the analysis, it was determined that there was no impairment to our long-lived assets. In addition, we performed an interim quantitative impairment assessment of goodwill on June 1, 2022, using a discounted cash flow approach, which did not result in impairment to goodwill. *There were no changes in circumstances or events which indicated a triggering event occurred or that the carrying value of our long-lived assets and goodwill may not be recoverable as of September 30, 2022.*

91.    The foregoing statement about the lack of triggering events with respect to goodwill impairment was false and misleading because, as they admitted in the 3Q22 10-Q/A, Defendants knew or recklessly disregarded that during 3Q22 they had "determined that because of continued deterioration in our stock price … there was an indication that a triggering event occurred and the carrying value of WUP Legacy may not be recoverable." Defendants knew or recklessly disregarded, therefore, that GAAP required that they perform a quantitative analysis based on "the present value of estimated future cash flows," considering "forecasted revenue growth rates and

margins, weighted average cost of capital, normalized working capital level and projected long-term growth rates." Defendants knew or recklessly disregarded, too, that the discount rate should have triggered their performing a quantitative impairment analysis and that the inputs they would have included in their discounted cash flow analysis had increased materially since June 1, 2022.

92.    In the 3Q22 10-Q, Defendants Dichter and Smith stated that Wheels Up's disclosure controls and procedures were effective:

### ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

As required by Rule 13a-15(b) under the Exchange Act, our management, including our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report. Based upon that evaluation, **our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures are effective at a reasonable assurance level.**

**Changes in Internal Control over Financial Reporting**

**[T]here were no changes in our internal control over financial reporting during the quarter ended September 30, 2022**, which were identified in connection with management's evaluation required by paragraph (d) of Rule 13a-15 and 15d-15 under the Exchange Act, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

93.    Defendants admitted in the 3Q22 10-Q/A that the foregoing was materially false or misleading.:

### ITEM 4. CONTROLS AND PROCEDURES

**Evaluation of Disclosure Controls and Procedures**

At the time of the Original 10-Q Filing, management, including our Chief Executive Officer and Chief Financial Officer, initially concluded that our disclosure controls and procedures were effective as of September 30, 2022. ***As a result of the restatement of the Company's financial statements and the material weakness identified below, management has reconsidered its assessment and now concludes that we did not maintain effective disclosure***

*controls and procedures*.

**Management's Report on Internal Control over Financial Reporting**

In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, management identified a material weakness in certain internal controls over financial reporting related to the financial statement close process. The deficiency resulted in a restatement of the Company's unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022 to recognize a non-cash goodwill impairment charge which should have been recognized during the three months ended September 30, 2022, which resulted in the understatement of Net loss for the three and nine months ended September 30, 2022.

Thus, Defendants knew or recklessly disregarded that Wheels Up's disclosure controls and procedures were ineffective as of September 30, 2022, due to a material weakness in the Company's internal control over financial reporting. This weakness resulted in Wheels Up's failure to impair the impair the Company's goodwill by $62 million as of September 30, 2022, and in turn, materially understating the Company's net loss.

## VI. THE TRUTH EMERGES

94.    On March 9, 2023, at 8:33 a.m., before the market opened, Defendants filed with the SEC a Current Report on Form 8-K, including as an exhibit a March 9, 2023, press release, announcing the Company's financial results for the year ended December 31, 2022. The Company reported a net loss of $507,547,000, total equity of $299,920,000, and a total goodwill impairment of $132 million, loss from operations of $512,007,000, and a loss per share of $2.06. The press release did not contain any disclosures indicating that Wheels Up had not finalized its December 31, 2022, financial statements or that any amounts reported therein were provisional or subject to change.

95.     The foregoing was materially false and misleading because, in violation of GAAP, Defendants knew or recklessly disregarded that the 2022 financial statements they disclosed were materially false. Defendants recording only a $132 million goodwill impairment, instead of the $180 million goodwill impairment overstated goodwill and total equity by $48 million. In addition, Defendants understated the Company's net loss from operations and net loss by $48 million and its loss per share by $0.20.

96.     On this news the price of Wheels Up common stock fell from a March 8, 2023, close of $11.50 to a March 9, 2023, close of $10.30, a 10.4% decline.

97.     On March 17, 2023, after market hours, the Company issued a Notification of Late Filing on Form 12b-25 regarding its 2022 10-K. The late filing form stated the following, in relevant part:

> ***The Company experienced unanticipated delays in compiling certain necessary information to complete its audited financial statements and prepare a complete filing of its Annual Report in a timely manner without unreasonable effort or expense.***
>
> The Company anticipates that the Annual Report will be filed as soon as practicable and prior to the fifteenth calendar day following the prescribed due date.

98.     As a direct and proximate cause of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

99.     On March 31, 2023, after the close of trading, the Company filed an 8-K/A with the SEC announcing it would restate its financial statements from September 30, 2022, to the present, and expected to report at least one material weakness. The 8-K/A stated in relevant part:

**Item 2.02 Results of Operations and Financial Condition**.

The Company is filing this Amendment No. 1 to the Original Filings

to reflect adjustments to the presentation of the Company's unaudited financial statements and reconciliations of Net loss to Adjusted EBITDA, in each case contained in the Original 3Q Press Release and the Original 4Q Press Release and incorporated by reference into the Original 3Q Filing and the Original 4Q Filing, respectively. In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, **the Company determined that non-cash goodwill impairment charges of (i) $62.0 million should have been recognized by the Company during the three months ended September 30, 2022, based on the Company's reassessment of the fair value of the legacy Wheels Up reporting unit (excluding Air Partner) ("WUP Legacy") as of September 30, 2022, and (ii) $118.0 million should have been recognized by the Company during the three months ended December 31, 2022 [and $180 million for the twelve months ended December 31, 2022], based on the assessment of the fair value of WUP Legacy as of December 31, 2022**, in each case that were necessary to reflect the diminished fair value of WUP Legacy as of the applicable measurement dates.

The recognition of non-cash goodwill impairment charges of $62.0 million for the three months ended September 30, 2022 and $118.0 million for the three months ended December 31, 2022 resulted in the following changes to the Company's unaudited condensed consolidated financial statements set forth in the Original Press Releases:

-For the three and nine months ended September 30, 2022, the Company recognized a charge for "Impairment of goodwill" of $62.0 million in the Company's unaudited condensed consolidated statements of operations, which resulted in:

o   a $62.0 million increase to the Company's Net loss for the three and nine months ended September 30, 2022 versus the previously reported financial results;

o   a revised Net loss of $148.8 million, or $0.61 per share, for the three months ended September 30, 2022, and $330.6 million, or $1.35 per share, for the nine months ended September 30, 2022; and

o   corresponding adjustments, and associated impacts of the adjustments, to:

- the balances of the "Goodwill" [of $459,847,000] and "Accumulated deficit" [of $1,050,964,000] line items in the Company's unaudited condensed consolidated balance sheets as of September 30, 2022;
- the balances of "Net loss" and "Impairment of goodwill" in the Company's unaudited condensed consolidated statements of cash flows for the nine months ended September 30, 2022; and
- the balances of "Net loss" and "Impairment of goodwill" and the "Impairment of goodwill" reconciling item in the Company's reconciliations of Net loss to Adjusted EBITDA for the three and nine months ended September 30, 2022.

-For the three months ended December 31, 2022, the Company decreased the charge for "Impairment of goodwill" by $14.0 million in the Company's unaudited condensed consolidated statements of operations versus what was reported in the Original 4Q Press Release, which resulted in:

o  a $14.0 million decrease to the Company's Net loss for the three months ended December 31, 2022 and, taking into account the impact of the non-cash goodwill impairment charge for the three months ended September 30, 2022, a $48 million increase to the Company's Net loss for the year ended December 31, 2022, in each case versus the previously reported financial results;

o  a revised Net loss of $224.9 million, or $0.91 per share, for the three months ended December 31, 2022, and $555.5 million, or $2.26 per share, for the year ended December 31, 2022; and

o  corresponding adjustments, and associated impacts of the adjustments, to the following items, in each case in the same manner described with respect to the "Impairment of goodwill" charge recognized during the three and nine months ended September 30, 2022 above:

- the Company's unaudited condensed consolidated balance sheets as of December 31, 2022;
- the unaudited condensed consolidated statements of cash flows for the year ended December 31, 2022; and
- the reconciliations of Net loss to Adjusted EBITDA for the three months and year ended December 31, 2022.
- The adjustments did not impact the Company's Adjusted EBITDA results for the three and nine months ended September 30, 2022 or the three months and year ended December 31, 2022.

100.    The 8-K/A further stated that "[t]e Company has assessed the materiality of this error in accordance with applicable SEC rules, and has concluded that the Prior Financial Statements should be restated," continuing "management has determined that a material weakness existed in the Company's internal control over financial reporting related to the financial statement close process for the three months ended September 30, 2022."

101.    Also on March 31, 2023, after the close of trading, Wheels Up filed the 3Q22 10-Q/A, including its restated financial results, reflecting the goodwill impairment and its impact, and its 2022 10-K. The amended 3Q22 10-Q and 2022 10-K disclosed the same financial results as the March 31, 2023, 8-K/A.

102.    In the 3Q22 10-Q/A, Wheels Up included the following "Explanatory Note":

### EXPLANATORY NOTE

We are filing this Form 10-Q/A to amend and restate our Form 10-Q for the fiscal quarter ended September 30, 2022, which was originally filed with the U.S. Securities and Exchange Commission (the "SEC") on November 9, 2022 (the "Original Form 10-Q"), to restate our previously issued unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022 (the "Prior Financial Statements"), and to amend related disclosures, including regarding controls and procedures.

### Background of Restatement

On March 31, 2023, we filed a Current Report on Form 8-K under Item 4.02(a) with the SEC relating to the Prior Financial Statements. As indicated in such Current Report on Form 8-K, in connection with the preparation of the audited financial statements to be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2022, we determined that a restatement of the Prior Financial Statements was necessary due to the identification of errors related to a non-cash goodwill impairment charge that should have been recognized in the Prior Financial Statements. The Company determined that a non-cash goodwill impairment charge of $62 million should have been recognized during the three months ended September 30, 2022. This

non-cash goodwill impairment charge resulted in:

•a $62.0 million increase to the Company's Net loss for the three and nine months ended September 30, 2022 versus the previously reported financial results;

•a revised Net loss of $148.8 million, or $0.61 per share, for the three months ended September 30, 2022, and $330.6 million, or $1.35 per share, for the nine months ended September 30, 2022; and

•corresponding adjustments, and associated impacts of the adjustments, to:

⚬the balances of the "Goodwill" and "Accumulated deficit" line items in the Company's unaudited condensed consolidated balance sheets as of September 30, 2022;

⚬the balances of "Net loss" and "Impairment of goodwill" in the Company's unaudited condensed consolidated statements of cash flows for the nine months ended September 30, 2022; and

⚬the balances of "Net loss" and "Impairment of goodwill" and the "Impairment of goodwill" reconciling item in the Company's reconciliations of Net loss to Adjusted EBITDA for the three and nine months ended September 30, 2022.

See Note 20, Restatement of Previously Issued Financial Statements included herein for additional information.

**Internal Control Considerations**

As a result of the restatement of the Company's financial statements and the filing of this Form 10-Q/A, management has determined that a material weakness existed in the Company's internal control over financial reporting related to the financial statement close process for the quarter ended September 30, 2022. The identified material weakness is further described in Item 4 within this Form 10-Q/A and the Company's remediation plan will be described in the Company's Annual Report on Form 10-K for the year ended December 31, 2022. In addition, as a result of the restatement of the Company's financial statements and the material weakness described above, management has reconsidered its assessment and now concludes that we did not maintain effective disclosure controls and procedures for the quarter ended September

30, 2022.

103.    In the 3Q22 10-Q/A, Defendants admitted that not only was there a triggering event as of September 30, 2022, contrary to their statement in the originally filed November 9, 2022, 3Q22 10-Q, but that it was an obvious one, decreasing stock price, which should have compelled a quantitative analysis and led to the impairment being recognized in 3Q22:

*Interim Impairment Test (As Restated)*

During the second quarter of 2022, we determined that because of a sustained decrease in the quoted market price of our Class A common stock, par value $0.0001 per share ("Class A common stock"), from the Closing Date, combined with a further decline in our operating margins, there was an indication that a triggering event occurred and the carrying value of our long-lived assets and goodwill may not be recoverable associated with the legacy Wheels Up reporting unit ("WUP Legacy"). As a result, we performed an undiscounted cash flow analysis of our long-lived assets for potential impairment as of June 1, 2022, and based on the analysis, it was determined that there was no impairment to our long-lived assets. In addition, we performed an interim quantitative impairment assessment of goodwill on June 1, 2022, using a discounted cash flow approach, which did not result in impairment to goodwill.

***During the third quarter of 2022, we determined that because of continued deterioration in our stock price, resulting in a market capitalization that was below the carrying value of our equity, there was an indication that a triggering event occurred and the carrying value of WUP Legacy may not be recoverable. As a result, we performed a quantitative impairment test using the income approach. The fair value using the income approach was based on the present value of estimated future cash flows. The significant underlying unobservable inputs used to measure the fair value included forecasted revenue growth rates and margins, weighted average cost of capital, normalized working capital level and projected long-term growth rates. As a result of this assessment, a goodwill impairment charge of $62.0 million was recorded to WUP Legacy as of September 30, 2022. The decline in the fair value of the reporting unit, as compared to the quantitative analysis performed as of June 1, 2022, was primarily due to an***

*increase in the discount rate.[10]*

104.    Regarding internal controls, Wheels Up further stated that:

> In connection with the preparation of the audited financial statements to be included in the Annual Report on Form 10-K, management identified a material weakness in certain internal controls over financial reporting related to the financial statement close process. The deficiency resulted in a restatement of the Company's unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022 to recognize a non-cash goodwill impairment charge which should have been recognized during the three months ended September 30, 2022, which resulted in the understatement of Net loss for the three and nine months ended September 30, 2022. The Company filed a Quarterly Report on Form 10-Q/A with the SEC on March 31, 2023 to restate the unaudited condensed consolidated financial statements as of and for the three and nine months ended September 30, 2022. The Company's remediation plan will be described in the Company's Annual Report on Form 10-K for the year ended December 31, 2022.

105.    In the 2022 10-K, Defendants admitted that declining stock price, alone sufficed to trigger a quantitative goodwill impairment analysis as of December 31, 2022, as it did for the goodwill impairment analysis as of June 1, 2022:

> ***Goodwill Impairment***
>
> ***During the second quarter of 2022, we determined that because of a sustained decrease in the quoted market price of our Class A common stock from the Closing Date***, combined with a further decline in our operating margins, there was an indication that a triggering event occurred and the carrying value of WUP Legacy may not be recoverable. As a result, we performed an interim quantitative impairment test as of June 1, 2022. Based on the analysis, the fair value of the reporting unit exceeded its carrying value and no impairment was recorded.
>
> ****

---

[10] The language in this paragraph was also in Wheels Up's March 31, 2023, 2022 10-K.

> *During December 2022, we saw sustained decreases in the quoted price of our Class A common stock and revised our forecast for the WUP Legacy reporting unit. As a result of these factors, we concluded a triggering event had occurred for WUP Legacy* and, accordingly, performed an interim quantitative impairment test over the reporting unit as of December 31, 2022. Using the income approach, we calculated the fair value of WUP Legacy as of December 31, 2022, based on the present value of estimated future cash flows. The significant underlying unobservable inputs used to measure the fair value included forecasted revenue growth rates and margins, weighted average cost of capital, normalized working capital level and projected long-term growth rates. As a result of this assessment, a goodwill impairment charge of $118.0 million was recorded to WUP Legacy. The decline in the fair value of the reporting unit, as compared to the quantitative impairment test performed as of October 1, 2022, was primarily due to the revised forecast for the reporting unit.

106.    The 2022 10-K also revealed material weaknesses regarding the Company's internal controls, stating in relevant part that "our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of December 31, 2022 due to material weaknesses in our internal control over financial reporting described below," continuing "[w]e did not maintain effective controls over information technology ("IT") for IT systems and applications that are relevant to the preparation of the consolidated financial statements." Further, Defendants stated, "[w]e did not maintain effective controls over the financial statement close and key business processes. Specifically, we did not consistently execute on our established accounting policies and procedures, and did not design, document and maintain controls to achieve complete, accurate and timely financial accounting, reporting and disclosures in accordance with GAAP." The Company continued "[t]hese include controls over account reconciliations, segregation of duties, review of journal entries and review of complex accounting matters. This deficiency resulted in a restatement of our unaudited condensed consolidated financial statements for the quarter and year-to-date period ended September 30, 2022."

107.   On this news, on the next trading day, Wheels Up's share price fell $0.072 per share, or 11.37%, to close at $0.5610 per share on April 3, 2023, damaging investors.

108.   As a direct and proximate cause of Defendants' wrongful acts and omissions, Plaintiff and other Class members have suffered significant losses and damages.

## VII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

109.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired the Company's securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

110.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

111.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

112.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

113.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

114.    To establish reliance on a class wide-basis, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- as a public issuer, the Company filed periodic public reports;

- the Company regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

115.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

116.    Based on the foregoing, the market for the Company's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

117.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

*of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## VIII.    COUNTS

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and
### SEC Rule 10b-5 Against All Defendants

118.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.    This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

120.    During the Class Period, in violation of Rule 10b-5(b), Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

121.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

122.    Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

123.    The Individual Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or any other of the Company's personnel to members of the investing public, including Plaintiff and the Class.

124.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

125.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

126.    As a direct and proximate result of Defendants' wrongful conduct alleged herein, Plaintiff and other members of the Class suffered damages in an amount to be established at trial.

127.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and SEC Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

## Form Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

128.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

129.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

130.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's' financial condition

and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

131. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

132. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## IX.    PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c) awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## X.     JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 7, 2024

**THE ROSEN LAW FIRM, P.A.**

By: _Jacob A. Goldberg_
Jacob A. Goldberg
Gonen Haklay
101 Greenwood Avenue, Suite 440
Philadelphia, PA 19046
Telephone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: ghaklay@rosenlegal.com

*Counsel for Lead Plaintiff and the Class*